**FILED**

2016 SEP 28  PM 5: 10

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | **1 : 16 CR 308** |
| v. | ) | |
| | ) | |
| ISMAEL JACINTO ACOSTA, aka IZZY | ) | CASE NO._____ |
| ALFONSO RODRIGO, | ) | Title 21, Section 846, United |
| DAVID URRABAZO-MALDONADO, JR., | ) | States Code |
| TENNILLE BRYANT, | ) | Title 21, Sections 841(a)(1), |
| JAMES CARVER, | ) | (b)(1)(A), (b)(1)(B), and |
| VAN HERRON, | ) | (b)(1)(C), United States Code |
| JOSE HERNANDEZ, | ) | Title 21, Section 843(b), United |
| OCTAVIO RODRIGO, | ) | States Code |
| JUAN CARLOS SOLIS, | ) | Title 18, Section 1952(a)(3), |
| MARIO AMADOR-RAMIREZ, | ) | United States Code |
| ROLAND FRANCISCO RIVERA-ERAZO, | ) | Title 18, Section |
| MAURICE WALKER, aka CAL, | ) | 1956(a)(1)(B)(i), United States |
| MANUEL MALDONADO, | ) | Code |
| REINALDO HERNANDEZ, | ) | Title 18, Section 1956(h), United |
| CESAR ZAMBRANO-ESPINAL, | ) | States Code |
| KELVIN ZAMBRANO, | ) | Title 18, Section 1957, United |
| JONATHAN STEPP, | ) | States Code |
| RYAN MILLER, | ) | Title 18, Section 2, United States |
| NANCY VARGAS, | ) | Code |
| MARGARET FERNANDEZ, | ) | |
| | ) | **JUDGE OLIVER** |
| Defendants. | ) | |
| | ) | |

COUNT 1

The Grand Jury charges:

Beginning at least as early as January 1, 2010, and continuing through September 28,

2016, the exact dates to the Grand Jury unknown, in the Northern District of Ohio, Eastern

Division, and elsewhere ISMAEL JACINTO ACOSTA, aka IZZY, ALFONSO RODRIGO, DAVID URRABAZO-MALDONADO, JR., TENNILLE BRYANT, JAMES CARVER, VAN HERRON, JOSE HERNANDEZ, OCTAVIO RODRIGO, JUAN CARLOS SOLIS, MARIO AMADOR-RAMIREZ, ROLAND FRANCISCO RIVERA-ERAZO, MAURICE WALKER, aka CAL, MANUEL MALDONADO, REINALDO HERNANDEZ, CESAR ZAMBRANO-ESPINAL, KELVIN ZAMBRANO, JONATHAN STEPP, and RYAN MILLER, the defendants herein, and others known and unknown to the Grand Jury did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together and with each other, and with diverse others known and unknown to the Grand Jury, to possess with intent to distribute and to distribute a mixture or substance containing a detectable amount of cocaine, heroin, and fentanyl. As to defendants ISMAEL JACINTO ACOSTA, ALFONSO RODRIGO, DAVID URRABAZO-MALDONADO, JR., TENNILLE BRYANT, JAMES CARVER, VAN HERRON, JOSE HERNANDEZ, and OCTAVIO RODRIGO did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together and with each other, and with diverse others known and unknown to the Grand Jury, to possess with intent to distribute and to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, to possess with the intent to distribute and to distribute at least 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and to possess with the intent to distribute and to distribute at least 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).  As to defendants JUAN CARLOS SOLIS, MARIO AMADOR-RAMIREZ, ROLAND FRANCISCO RIVERA-ERAZO, MAURICE WALKER, aka CAL,

MANUEL MALDONADO, REINALDO HERNANDEZ, CESAR ZAMBRANO-ESPINAL, KELVIN ZAMBRANO, JONATHAN STEPP, and RYAN MILLER did unlawfully knowingly, and intentionally combined, conspire, confederate, and agree together and with each other, and with diverse others known and unknown to the Grand Jury, to possess with intent to distribute, and to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and to possess with the intent to distribute and to distribute a quantity of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## MANNER AND MEANS OF THE CONSPIRACY

A.      It was part of the conspiracy that co-conspirators obtained heroin, cocaine, fentanyl, and marijuana from suppliers in the Chicago, Illinois; Yonkers, New York; and Cleveland, Ohio, areas and elsewhere.

B.      It was part of the conspiracy that ISMAEL JACINTO ACOSTA obtained heroin from suppliers in the Chicago area.

C.      It was part of the conspiracy that co-conspirators, including but not limited to, JOSE HERNANDEZ, altered or built into, or supplied vehicles with, aftermarket trap compartments for the purposes of transporting illegal narcotics or narcotics proceeds without law enforcement detection.

D.      It was part of the conspiracy that conspirators, including but not limited to, ALFONSO RODRIGO, ISMAEL JACINTO ACOSTA, DAVID URRABAZO-MALDONADO, JR., VAN HERRON, JOSE HERNANDEZ, JUAN CARLOS SOLIS, MARIO AMADOR-RAMIREZ, CESAR ZAMBRANO-ESPINAL, KELVIN ZAMBRANO, and RYAN MILLER, would use

vehicles with aftermarket trap compartments for the purposes of transporting illegal narcotics or narcotics proceeds without law enforcement detection.

E.    It was part of the conspiracy that CESAR ZAMBRANO-ESPINAL used 3xxx West 130th Street, Cleveland, Ohio, to store and distribute narcotics and narcotics proceeds.   It was also part of the conspiracy that ZAMBRANO-ESPINAL would distribute narcotics, including heroin and cocaine, to JONATHAN STEPP, RYAN MILLER, REINALDO HERNANDEZ and others, who would then re-distribute the narcotics in the Northern District of Ohio.

F.    It was part of the conspiracy that CESAR ZAMBRANO-ESPINAL used designated and frequently changing telephones to communicate with his narcotics customers. It was further part of the conspiracy that ZAMBRANO-ESPINAL broke his telephones prior to throwing them away in his trash in order to prevent a search by law enforcement.

G.    It was part of the conspiracy that MARIO AMADOR-RAMIREZ delivered narcotics to CESAR ZAMBRANO-ESPINAL and collected narcotics proceeds from ZAMBRANO-ESPINAL at the direction of ISMAEL JACINTO ACOSTA.

H.    It was part of the conspiracy that ALFONSO RODRIGO and OCTAVIO RODRIGO used 18xxx Maple Heights Boulevard, Maple Heights, Ohio, to store and distribute narcotics and narcotics proceeds.   MAURICE WALKER and others, at the direction of ALFONSO RODRIGO, provided and sold drugs and had access to stash houses and other places where narcotics were secreted.

I.    It was part of the conspiracy that co-conspirators used commercial bus lines to transport narcotics and narcotics proceeds.   Specifically, JOSE HERNANDEZ used a commercial bus line to attempt to transport two kilograms of heroin from Chicago, Illinois, to Cleveland, Ohio. MANUEL MALDONADO used another bus line to transport approximately $125,040 from

4

Cleveland, Ohio, to Yonkers, New York. TENNILLE BRYANT used a commercial bus line to transport approximately one kilogram of fentanyl from Yonkers, New York, to Cleveland, Ohio. DAVID URRABAZO-MALDONADO, JR., used a commercial bus line to attempt to transport $40,000 from either Washington, D.C. or New York City to Cleveland, Ohio. ROLAND FRANCISCO RIVERA-ERAZO accepted money from MANUEL MALDONADO, and was stopped outside MALDONADO'S hotel room with $125,040 in a backpack.

J.      It was part of the conspiracy that ALFONSO RODRIGO and OCTAVIO RODRIGO used code words to encode telephone numbers. Specifically, ALFONSO RODRIGO and OCTAVIO RODRIGO obtained prepaid cellular telephones, and on the same date the telephones were activated, encoded their assigned telephone numbers into a series of letters, and then texted the series of letters to unknown persons in Mexico in order to thwart law enforcement detection.

K.      It was part of the conspiracy that co-conspirators used multiple prepaid cellular telephones to communicate with one another. It was further part of the conspiracy that members periodically changed their telephone numbers, especially in response to law enforcement action.

L.      It was part of the conspiracy that co-conspirators, including but not limited to ALFONSO RODRIGO, OCTAVIO RODRIGO, and DAVID URRABAZO-MALDONADO, JR., arranged for JAMES CARVER, TENNILLE BRYANT, and others, to transport one kilogram of fentanyl from Yonkers, New York to 18xxx Maple Heights Boulevard, Maple Heights, Ohio.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

In furtherance thereof, and to effect the goals and conceal the existence of the conspiracy, the defendants and others performed overt acts in the Northern District of Ohio and elsewhere, including but not limited to the following:

5

1.    On or about February 1, 2010, VAN HERRON and a companion known to the Grand Jury but not indicted herein (hereinafter referred to as A.L.), flew together via a commercial airline from Cleveland, Ohio to the Philadelphia International Airport in possession of approximately $24,000 in United States currency from narcotics proceeds. HERRON and A.L. were both scheduled to board a commercial flight in Philadelphia destined for Phoenix, Arizona. HERRON, after being approached by DEA Agents, stated he was going to Arizona to party, and would be staying with "Fonzo" (ALFONSO RODRIGO). HERRON would not tell the officers the address or a phone number for "Fonzo." When asked how he would contact "Fonzo," HERRON replied, "You know."

2.    On or about April 24, 2010, ISMAEL JACINTO ACOSTA and ALFONSO RODRIGO were traveling together in a vehicle in Aurora, Illinois. Within the vehicle was a suitcase containing $13,000 in United States currency from narcotics proceeds.

3.    On or about June 10, 2010, in the Northern District of Ohio, VAN HERRON drove a Dodge Ram pickup truck displaying Arizona registration ADP4751, registered to ISMAEL JACINTO ACOSTA at 6xxx West Vermont Avenue, Glendale, Arizona. HERRON, upon being stopped by law enforcement, possessed $8,858 in United States currency from narcotics proceeds.

4.    On or about September 27, 2014, in the Northern District of Ohio, ALFONSO RODRIGO possessed and controlled approximately one-half kilogram of heroin, approximately $62,560 in United States currency, digital scales, 24 cellular telephones, false identifications, a money counter, MoneyGram wire receipts, and a Hyundai registered to RODRIGO with an aftermarket trap compartment, and two other vehicles with aftermarket trap compartments, including an Infiniti G35 and a black GMC Envoy, all located at 5xxx Bridgewater Road,

6

Lyndhurst, Ohio. One of the cell phones possessed and controlled by RODRIGO only had one contact and set of calls, to and from a UPS Store in Madera, California. Several of the cell phones were divided into mostly geographic contacts, for the New York City, New York; Atlanta, Georgia; central California areas, and a phone with primarily Mexican contacts. The phones also contained evidence of multiple airline flights and commercial bus trips.

5.     On or about October 25, 2014, JOSE HERNANDEZ traveled from the Chicago, Illinois area, to the Cleveland, Ohio area and transported a quantity of narcotics for re-distribution.

6.     On or about October 25, 2014, JOSE HERNANDEZ and JUAN CARLOS SOLIS went to 10xxx Loretta Avenue Cleveland, Ohio, the residence of MARIO AMADOR-RAMIREZ, and delivered a quantity of narcotics into the residence in a black plastic bag.

7.     On or about October 26, 2014, CESAR ZAMBRANO-ESPINAL drove a blue Ford Explorer and parked in the driveway of 10xxx Loretta Avenue, Cleveland, Ohio. ZAMBRANO-ESPINAL exited the blue Explorer and entered the residence via the front door. Approximately three minutes later, ZAMBRANO-ESPINAL exited the residence with a quantity of narcotics he was going to re-distribute, re-entered the blue Ford Explorer, and departed the residence.

8.     On or about November 10, 2014, ISMAEL JACINTO ACOSTA called a commercial bus line bus travel service to inquire about travel for JOSE HERNANDEZ from Chicago, Illinois, to Cleveland, Ohio, via a commercial bus line on or about November 12, 2016.

9.     On or about November 10, 2014, MANUEL MALDONADO transferred narcotics proceeds in the amount of $2,000 via Western Union to an individual known to the Grand Jury not charged herein (hereinafter referred to as M.Q.), at the direction of ALFONSO

RODRIGO.  M.Q., the receiver, listed a Mexican phone number on the money order.

10.     On or about November 12, 2014, at approximately 8:30 a.m., JOSE

HERNANDEZ arrived at 10xxx Loretta Avenue, Cleveland, Ohio, in a gold Chevrolet Equinox

and exited the passenger seat carrying two bags into the residence.

11.     On or about November 18, 2014, RYAN MILLER sold a confidential informant

(hereinafter referred to as CS-7) one ounce of cocaine at 3xxx Poe Avenue, Cleveland, Ohio.

MILLER told CS-7 that he was going to see "CESAR" (ZAMBRANO-ESPINAL) to pay him

money to obtain more cocaine.

12.     On or about December 5, 2014, RYAN MILLER sold CS-7 24.8 grams of cocaine

at 3xxx Poe Avenue, Cleveland, Ohio.

13.     On or about Tuesday, December 9, 2014, at approximately 10:02 a.m., ISMAEL

JACINTO ACOSTA called JOSE HERNANDEZ on the telephone. During the conversation,

ACOSTA told HERNANDEZ, "I just sent a message with an address." HERNANDEZ replied

"Yeah," to which ACOSTA added, "And, hum, and I need to see if you could send me the title

(for a vehicle with an aftermarket trap compartment) there so you can, send it in, so you can go

to the post office and put it in for tomorrow.   It costs 20 dollars."  ACOSTA then asked

HERNANDEZ to send it overnight, and explained "so that tomorrow they can, they can, I mean,

it's that the car was wrongly parked and the tow truck took it away, and they need it to get it out."

Later during the conversation, ACOSTA stated, "I sent you an address. Do you have something

to write down the name?"   ACOSTA then verbally provided HERNANDEZ with the name

"ALFONSO RODRIGO."   ACOSTA stated, "And I sent you the address via text. If you want,

call me when you are at the post office."

14.     On or about December 9, 2014, at approximately 10:53 a.m., JOSE HERNANDEZ called ISMAEL JACINTO ACOSTA on the telephone. During the call, ACOSTA stated, "Tell me?" HERNANDEZ answered, "Listen, what, what name did you tell me? Rodrigo? ALFONSO RODRIGO?" ACOSTA then stated, "ALFONSO, ALFONSO RODRIGO." HERNANDEZ stated "Okay. Alright then. Right now I, I'll send it in, I'm here at the Post Office." ACOSTA stated, "Alright then. That's it. You got the address, right?" HERNANDEZ: stated, "Yes, it's 1xxx on Brainard Avenue." Later in the conversation, ACOSTA stated, "So it can arrive in the morning. It's going to cost 20 dollars." HERNANDEZ stated, "Yes, I'm going to ask for the fastest service right now." ACOSTA stated, "Yes. Overnight. Alright then. Thank you."

15.     On or about December 9, 2014, JOSE HERNANDEZ, shipped a parcel (document related to vehicle title) via overnight service to ALFONSO RODRIGO, 1xxx Brainard, Lyndhurst, Ohio, with a return address of JUAN SOLIS, 5xxx W. 64th Place, Chicago, Illinois.

16.     On or about December 11, 2014, at approximately 5:35 p.m., JOSE HERNANDEZ called ISMAEL JACINTO ACOSTA on the telephone. During the conversation, HERNANDEZ stated, "I already, I already, deposited what you told me to the card." ACOSTA stated, "Oh good." HERNANDEZ asked, "Grab, Two (two kilograms of heroin), right, for tomorrow at midnight?" ACOSTA stated, "Okay." HERNANDEZ stated, "And then." ACOSTA replied, "I'll get them. If I don't get them today, I'll get them tomorrow." HERNANDEZ stated, "Yes. So you can send them to me here to, the, send them here too." ACOSTA stated, "Yes, I have your son's here. I have the email there." HERNANDEZ stated, "Oh, good. So then, if not, then to mine. And then." ACOSTA stated,

9

"Oh, okay. One of the two." HERNANDEZ stated, "What was I going to tell you? I, I, well, right now they just are, I took two, I just took two little bottles." ACOSTA stated, "Oh, good. Yes. Well, if you can help me out with a few more, but I'll let you know in the morning." HERNANDEZ stated, "Right now, well, right now I did buy [mumbles] hey, how much are those over there?" ACOSTA replied, "Here? The thing is that there are some places that sometimes have. You understand me? But over there with my buddy, with my buddy over where I buy the Sols (Mexican brand of beer) from. They are cheap there. The guy gives them to me for cheap." HERNANDEZ stated, "No, calm down. [Mumbles] They are a bit pricey over there, but how much do they sell them for over there?" ACOSTA stated, "I don't know. You know how I never, I never get them here." HERNANDEZ stated, "Oh, you, you don't know? Well, either way." ACOSTA stated, "No." HERNANDEZ: stated, "I will, I go to a, a liquor store that I go to, they gave them to me for 66, 60 something dollars." ACOSTA stated, "Yes, that's more or less. Yes, my buddy gives them to me at 65 for me." HERNANDEZ stated "Yes, yes. They are around that price more or less. Alright." ACOSTA stated, "Alright then." HERNANDEZ stated, "So then, right now I just took two (kilograms of heroin), but I have them here." ACOSTA stated, "But did you send me any with this one in the morning?" HERNANDEZ stated, "No, no, because everything was closed and" ACOSTA replied, "Oh." HERNANDEZ stated, "It was, the liquor store is open until ten (10:00) and. . ." ACOSTA stated, "Oh." HERNANDEZ stated, "Where I went here to, here where they open the, here nearby where I am." ACOSTA stated, "Uh-huh." HERNANDEZ stated, "The thing is that there was only the, the 12 kind and well, I said, 'well, I don't think he is going to want of the 12.' There was only the 12 kind and no, I said, 'no, not this one, no, no,' that's why no." ACOSTA stated, "That's fine." HERNANDEZ stated, "They didn't have any of the 18, and with him I

10

wasn't able to I wasn't able to, to tell you the truth, I wasn't able to send you anything." ACOSTA stated, "Oh, well. That's fine. Look." HERNANDEZ stated, "But, then." ACOSTA stated, "Uh, if you want, in the morning, I will, [stammers] for tomorrow so that it can be here on Saturday, right?" HERNANDEZ stated, "Yes. Yes, that's why. No, no. Tomorrow, tomorrow Friday. You get it tomorrow Friday at midnight so it." ACOSTA stated, "So it can be here on Saturday." HERNANDEZ stated, "Can be there early in the morning." ACOSTA stated, "Oh, okay. Alright, then. So then, let me, What I am going to do, if he, you need anything else, um, I will tell you tomorrow." HERNANDEZ stated, "So then you, you call me and then you let me know so I can go early to get." ACOSTA stated, "Yes." HERNANDEZ stated, "Whatever I am going to get, and then at midnight, I will, just for, no well, then uh." ACOSTA stated. "Yes, I will call you before [Unintelligible]. I will let you know everything." HERNANDEZ stated "Alright, then." ACOSTA stated, "Alright, then. Thank you."

17. On or about December 12, 2014, at approximately 9:17 a.m., ACOSTA called JOSE HERNANDEZ on the telephone. During this call, ACOSTA asked HERNANDEZ to bring him four bottles.

18. On or about December 12, 2014, at approximately 11:28 p.m., JUAN CARLOS SOLIS and JOSE HERNANDEZ traveled in a 2001 blue Oldsmobile van to a commercial bus line depot stop in Chicago, Illinois, and had in their possession and control a black "Member's Only" suitcase which contained two kilograms of heroin.

19. On or about December 12, 2014, shortly thereafter, JUAN CARLOS SOLIS and JOSE HERNANDEZ walked towards the rear of the bus and HERNANDEZ dropped the black "Member's Only" suitcase with the two kilograms of heroin at the rear of the bus with the luggage from other passengers that would be placed onto the bus by commercial bus line

11

employees.  SOLIS and HERNANDEZ then attempted to board the bus.

20.  On or about December 12, 2014, JUAN CARLOS SOLIS and JOSE HERNANDEZ spoke with DEA interdiction agents and stated that they were not in possession or control of anything they were not supposed to have.  SOLIS, when asked whether they had any other bags with them, told DEA interdiction agents that they only had the two backpacks which they were carrying.  HERNANDEZ made no comments disagreeing or supplementing SOLIS' response that they had no other bags.  DEA interdiction agents seized the "Member's Only" suitcase and determined that the bag contained two kilograms of heroin.

21.  On or about December 13, 2014, at approximately 7:15 a.m., JOSE HERNANDEZ called ISMAEL JACINTO ACOSTA on the telephone. During the conversation, HERNANDEZ stated, "Listen, I'm just here, man.  Uh, who is going to go there to, to pick us up?"  ACOSTA stated, "Uh, I'm going to call Pepe right now."  HERNANDEZ stated, "Listen, no, uh, let me tell you. I'll explain it to you well in a bit, alright?  Tell him that when he goes there, for him to stay there, get out of their car, and for him to stay there where this vehicle stops.  Have him stay exactly there where one gets off so that he, he can pick up the luggage and I'll explain it to him later.  So that I can tell him and he, he, he picks it up. So that he can pick it up and he leave."  ACOSTA stated, "For him to pick it up?"  HERNANDEZ stated, "Yes. Yes, yes. Right now I'll, it's just that I can't talk too much right now, but, it's just that [Unintelligible]."  ACOSTA stated, "Yes, I know, but."  HERNANDEZ stated, "Yeah, I had a little problem here.  You know, I'm very worried, big time.  But that is just for security, you know what I mean?  Because I was not supposed to have any luggage here to bring, supposedly." ACOSTA, stated, "Okay, Uh."  HERNANDEZ then stated, "It's just that, I'm going to, I'm just going to signal him so that when the bus gets there, he can be there already.

12

I'll just signal to him and we can leave." ACOSTA asked, "When will you get there?"
HERNANDEZ stated, "About 45 minutes, I think, man. About 45." ACOSTA stated, "Yeah,
but are they going to give it to him?" HERNANDEZ stated, "No, no, I'm going to be there
when they unload the thing. "It's just for him to get it and leave." ACOSTA stated, "Oh, you'll
leave separately?" HERNANDEZ stated, "Yes. He can go. Later on he can come back or
something. I'll go to one of the. . ." ACOSTA stated, "Oh." HERNANDEZ stated, "They're
nearby, but what I want is just to rid myself of doubt there." ACOSTA stated, "Okay, alright."
HERNANDEZ stated, "Yes, but he needs to be there on the ready. He better not fail me, please."
ACOSTA stated, "I'll call right now." HERNANDEZ stated, "Alright, then."
(HERNANDEZ was concerned that he was under law enforcement or security surveillance. To
elude surveillance, he asked ACOSTA to send a third party to the bus terminal in Cleveland to
retrieve the bag containing the 2 kilograms of heroin from the bus).

    22.    On or about December 13, 2014, at approximately 7:21 a.m., JOSE
HERNANDEZ received a call from ISMAEL JACINTO ACOSTA. During this call,
HERNANDEZ stated, "Hello?" ACOSTA asked, "What happened?" HERNANDEZ stated,
"Nothing, just here, I'm here, just crossing the toll booth." ACOSTA stated sighing, "Yes?"
HERNANDEZ stated, "Yes." ACOSTA stated, "Hey, I told this one and he got, he got kind of
f**king nervous," (the person who ACOSTA was trying to get to go to bus depot was nervous
because of the heroin). HERNANDEZ stated, "No, no, no. Nothing is going to happen. It's just,
what I want it's just, [pause] is to mislead, do you understand? That's it." ACOSTA asked, "A
what?" HERNANDEZ replied, "It's just that I can't talk much. All I need is a mislead, I need,
I need to know if I don't have a tail, or things like that to give a, supposedly, I don't. I will be
there just tell them. That he grabs it and [Unintelligible]. That's it." ACOSTA stated, "Okay,

okay. Do me a favor? Uh." HERNANDEZ stated, "Tell me." ACOSTA stated, "Give me the number of your partner, so I can give him a call." HERNANDEZ stated, "The what?" ACOSTA stated, "Your partner's number, [pause] send it to me in a message or over the phone." HERNANDEZ stated, "Uh? This one?" ACOSTA stated, "No, your partner's." HERNANDEZ stated, "That's right, but it's just that I am with both. Yes. [Stammers]. It's just for him to park over there and the thing is that I want him there, so he can just grab it, and I don't, well, you understand, right?" ACOSTA stated, "Yes, I understand." HERNANDEZ stated, "Nothing is happening." ACOSTA stated, "What happened is that this one, f**king, just now when I told him (the person ACOSTA contacted to retrieve the bag). So then, let me, let me see if I can head over there myself." HERNANDEZ stated, "Or, or you can tell the other one. I don't know. Nothing is going to happen, I just want to mislead everything, man. [Pause] I just want to make sure that, well, that's not coming [Stammers] that I don't come with anybody, nobody. Yes. Just for him to be there, to be right there to grab that and that's it. [Stammers] They are not even going to notice it. That's only, only, [Mumbles] No." ACOSTA stated, "Hold on, let me call you." HERNANDEZ stated, "Alright then." During this call, ACOSTA stated that the person who was supposed to pick up HERNANDEZ at the bus terminal was afraid to retrieve the heroin. HERNANDEZ reiterated that he may have been under surveillance and wanted another person to retrieve the luggage. ACOSTA told HERNANDEZ he would pick HERNANDEZ up himself.

23.  On or about December 13, 2014, at approximately 7:28 a.m., JOSE HERNANDEZ received a call from ISMAEL JACINTO ACOSTA. During this conversation, HERNANDEZ stated, "I'm just here, man." ACOSTA sighed. HERNANDEZ stated "We're here." ACOSTA stated, "Listen, um, right now I'm going to, he panicked on me."

14

HERNANDEZ stated, "Hum. So then what?"  ACOSTA stated, "I'm trying to get something, but the surest thing is that, I already called the taxis, but they told me forty (40), thirty-five (35) minutes, for them to come get me. So then."  HERNANDEZ stated, "Oh, it's just that I need someone. I can't stay there myself.  No, no. It's just that, I'm only doing this to, to assure myself and all those things."  ACOSTA stated, "Yeah? Well, you tell me."  HERNANDEZ stated, "It's that I can't, I can't be there with that. I don't want to [Unintelligible]. [mumbles] it's just a matter of him being there [mumbles], just to get the luggage. That's it and then we're off."  ACOSTA stated, "Let me [Unintelligible] something smells here."  HERNANDEZ stated, "What? What are they going to say? Go and [Unintelligible] that."  ACOSTA stated, "Excuse me?" HERNANDEZ stated, "It's just to, be there.  Be present there. [Unintelligible] it's just that, instead of me getting it, he's going to get it.  He's going to get the luggage. And that's all."  ACOSTA stated, "Yes, yes, I know, but, what can I tell you?  Well, right now when I told him that, [mumbles]."  HERNANDEZ stated, "Yes, but, so then how are we going to do it? I can't stay there [Unintelligible].  F**king [Unintelligible].  That's a problem. I can't walk with it. I don't want to be, [Unintelligible] and we're out of there in a flash."  ACOSTA stated, "Hum. Alright. Let me, let me see what."  HERNANDEZ stated, "Alright, because we're already, I'm already over here close by to."  ACOSTA stated, "Yes, Yes. I know, I know."

24.     On or about December 13, 2014, at approximately 7:51 a.m., JOSE HERNANDEZ received an incoming call from ISMAEL JACINTO ACOSTA.  During the conversation, HERNANDEZ stated, "I'm already here."  ACOSTA stated, "I'm already here now."  HERNANDEZ asked, "You're already there?"  ACOSTA stated, "Yes, I'm just getting here now."  HERNANDEZ stated, "Okay. It, this already, this already got down. I'm going to arrive in about five minutes, I think."  ACOSTA stated, "Alright. Well, I'm here."

HERNANDEZ stated, "Oh, alright then. I'll see you there then."  ACOSTA stated, "Yeah."

HERNANDEZ then said, "Excuse me?" ACOSTA stated, "[Mumbles] I'm going to be,

[Mumbles] I'm close by here."  HERNANDEZ stated, "Yes, it's just so that, bring it up right

away." ACOSTA stated, "Yes."  HERNANDEZ stated, "In a bit, in a bit I'll explain it to you

and then [Unintelligible]."  ACOSTA stated, "Yes, yes. I'll wait for you here."  HERNANDEZ

stated, "Alright."  ACOSTA stated, "I'm waiting for you here now."  HERNANDEZ stated,

"Alright, then."

25.     On or about December 13, 2014, at approximately 7:53 a.m., ISMAEL JACINTO

ACOSTA drove a tan Mercury Sable, bearing Ohio registration GGS4044, and parked along the

curb of E. 22nd Street, directly across the street from a commercial bus line bus stop in

Cleveland, Ohio.

26.     On or about December 13, 2014, at approximately 8:07 a.m., JOSE

HERNANDEZ called ISMAEL JACINTO ACOSTA on the telephone.   During the

conversation, ACOSTA stated, "I'm already getting here."  HERNANDEZ stated, "Where are

you?" ACOSTA stated, "I'm here in front. Where they put a little."  HERNANDEZ stated,

"Okay."  ACOSTA stated, "Did you see me?"  HERNANDEZ stated, "No. I'm barely going to

get off here right now."

27.     On or about December 13, 2014, at approximately 8:08 a.m., JOSE

HERNANDEZ and JUAN CARLOS SOLIS arrived at the Stephanie Tubbs Jones Transit Center

on a commercial bus line. HERNANDEZ and SOLIS walked to the rear cargo area where they

stood with the group of passengers waiting for their luggage at the rear of the bus.   A

commercial bus line employee opened the rear luggage cargo area and began removing bags.

SOLIS and HERNANDEZ both peered into the rear cargo area as if looking for a bag.

HERNANDEZ and SOLIS spoke with a commercial bus line employee, then continued looking for a bag in the rear cargo area for several minutes. After several minutes, HERNANDEZ walked across E. 22nd Street and stood on the sidewalk. SOLIS remained at the bus and continued looking for a bag in the rear cargo area.

28. On or about December 13, 2014, at approximately 8:13 a.m., JOSE HERNANDEZ received a call from ISMAEL JACINTO ACOSTA. During the call, ACOSTA stated, "I'm over here in front." HERNANDEZ stated, "Hello?" ACOSTA stated, "I'm over here in front. On the other side." HERNANDEZ stated, "What side?" ACOSTA stated, "By the traffic light." HERNANDEZ stated, "Alright, then [Unintelligible]. You're here?"

29. On or about December 13, 2014, at approximately 8:15 a.m., JUAN CARLOS SOLIS walked away from a commercial bus line toward the Sable that ISMAEL JACINTO ACOSTA occupied. Around the same time, JOSE HERNANDEZ placed a bag into the trunk of the Sable. HERNANDEZ entered the passenger seat of the Sable. At approximately 8:17 a.m., SOLIS, ACOSTA, and HERNANDEZ departed in the Sable heading northbound on East 22nd Street, in Cleveland, Ohio.

30. On or about December 13, 2014, at approximately 8:45 a.m., the tan Mercury Sable arrived and parked in the driveway of ISMAEL JACINTO ACOSTA's residence, located at 3xxx East Overlook Road, Cleveland Heights, Ohio.

31. On or about December 13, 2014, ISMAEL JACINTO ACOSTA drove the tan 2004 Mercury Sable, with an aftermarket compartment, registered to a person known to the Grand Jury but not indicted herein (hereinafter referred to as E.Z.).

32. On or about December 28, 2014, JOHNATHAN STEPP used a money counter to count and prepare approximately $30,000 in U.S. currency that STEPP stated was to be paid to

17

"CESAR" (ZAMBRANO-ESPINAL) for narcotics.

33. On or about December 28, 2014, JONATHAN STEPP took the $30,000 and drove to a parking lot located at 1x Berea Road, Cleveland, Ohio. STEPP parked in the parking lot beside a light brown/tan vehicle occupied by CESAR ZAMBRANO-ESPINAL. STEPP exited the car he drove with the money, entered ZAMBRANO-ESPINAL's vehicle, and gave ZAMBRANO-ESPINAL the money for payment for narcotics.

34. On or about December 31, 2014, OCTAVIO RODRIGO wired, via MoneyGram, an individual known to the Grand Jury but not charged herein (hereinafter referred to as J.T.), $2,000 in narcotics proceeds.

35. On or about January 15, 2015, at approximately 5:23 p.m., ISMAEL JACINTO ACOSTA called CESAR ZAMBRANO-ESPINAL on the telephone. During the conversation, ACOSTA stated, "Uh, why don't you help me out, go get a pair of those (phones to use for drug conversations) to, to have it right now. Because I haven't had a chance to go get them." ZAMBRANO-ESPINAL stated, "you are not going to stop by?" ACOSTA stated, "Yes, I am going to stop by over there to, to see if, uh, we check that out." ZAMBRANO-ESPINAL stated, "Uh, well, that's, that's set. For the paper (money)." ACOSTA stated, "Yes, that's why but [stammers] what I need is, why don't you go to the store and buy two calling cards, to bring one." ZAMBRANO-ESPINAL stated, "Okay. That's fine." ACOSTA stated, "Yes? You'll buy them?" ZAMBRANO-ESPINAL stated, "Yes. I am going to go." ACOSTA stated, "Alright then. I'll see you shortly in about an hour and, one hour and a half. I'll call you when I'm headed that way." ZAMBRANO-ESPINAL stated, "That's fine. [pause] Bye."

36. On or about January 15, 2015, at approximately 5:47 p.m. CESAR ZAMBRANO-ESPINAL purchased and activated two cell phones for the purpose of using them to transact

narcotics business with, among others, ISMAEL JACINTO ACOSTA.

37.     On or about January 15, 2015, at approximately 6:56 p.m., ISMAEL JACINTO ACOSTA called CESAR ZAMBRANO-ESPINAL on the telephone.   During the conversation, ZAMBRANO-ESPINAL stated, "What's up?" ACOSTA stated, "Nothing. Are you there?" ZAMBRANO-ESPINAL stated, "Almost, yes, I'm about to arrive. I'll be there in about five minutes." ACOSTA stated, "I'll drop by."   ZAMBRANO-ESPINAL stated, "Alright."

38.     On or about January 15, 2015, at approximately 6:58 p.m., ISMAEL JACINTO ACOSTA drove to 3xxx West 130th Street, Cleveland, Ohio, CESAR ZAMBRANO-ESPINAL's residence, in a gold Chevrolet Equinox with an aftermarket trap compartment. Approximately one minute later, the tan 2004 Mercury Sable with an aftermarket trap compartment, arrived at 3xxx West 130th Street.

39.     On or about January 20, 2015, at approximately 12:18 p.m., ISMAEL JACINTO ACOSTA called MARIO AMADOR-RAMIREZ on the telephone.   During the conversation, AMADOR-RAMIREZ stated, "No, well, [stammers] once, once, uh, son of a b**ch, what can I do! Unless your lady takes me and drops me off over there at the airport. At what time is the flight?"   ACOSTA stated, "You don't have it?   You need to grab it, deposit it and then I'll get it, you understand me? I'm going to get it for tomorrow."   AMADOR-RAMIREZ stated, "For tomorrow?"   ACOSTA stated, "Yes, because you are going to go with the mechanic (JOSE HERNANDEZ) because I need you to bring me a truck (vehicle with three aftermarket trap compartments) that I have there."   AMADOR-RAMIREZ stated, "Oh, so I'm, directly over there. Okay."   ACOSTA stated, "And I need, I need you to call Southwest right now to see if they, if they give you some kind of credit for the flight you lost."

19

40.     On or about January 20, 2015, at approximately 12:26 p.m., ISMAEL JACINTO

ACOSTA called JOSE HERNANDEZ on the telephone.   During the conversation, ACOSTA

stated, "How are you? Hey! Uh, I need you to call to this, this gentleman."   HERNANDEZ

stated, "Okay."   ACOSTA stated, "And tell him to, to bring you the, the, the extra one (vehicle

with an aftermarket trap compartment)."   HERNANDEZ stated, "Okay." ACOSTA stated, "For,

uh, I will be sending mouse over there tomorrow.   He will be stopping by to pick it up. Yeah?"

HERNANDEZ stated, "Alright then."   ACOSTA stated, "So then, I think, for, you can, you

don't have much work right now, right?"   HERNANDEZ stated, "No."   ACOSTA stated, "Oh,

okay. For him to, he is going to arrive there, there nearby you so he can pick it up and then leave.

Huh."   HERNANDEZ stated, "Alright then. That's fine. Have him call me."

41.     On or about January 21, 2015, at approximately 9:30 a.m., JOSE HERNANDEZ

was observed working in the bed of a silver Chevrolet Silverado pickup truck, (with three

aftermarket trap compartments) bearing Illinois registration 1658008-B, in the alleyway behind

his residence at 5xxx W. 64th Place, Chicago, Illinois, preparing the vehicle to be used to

transport narcotics.

42.     On or about January 21, 2015, at approximately 2:32 p.m., MARIO AMADOR-

RAMIREZ exited a commercial flight at Chicago Midway Airport from Phoenix, Arizona.

AMADOR-RAMIREZ was picked up and driven to JOSE HERNANDEZ's residence, located at

5xxx W. 64th Place, Chicago, Illinois.

43.     On or about January 22, 2015, MARIO AMADOR-RAMIREZ traveled

eastbound in the vicinity of Interstate 90 from Chicago, Illinois toward Toledo, Ohio, driving the

same silver Chevrolet Silverado pickup truck (with three aftermarket trap compartments),

bearing Illinois registration 1658008-B.

20

44.     On or about January 22, 2015, at approximately 10:24 a.m., ISMAEL JACINTO ACOSTA called MARIO AMADOR-RAMIREZ.  During this call, ACOSTA told AMADOR-RAMIREZ to head over to his "buddy's" in Michigan.  Throughout the day, ACOSTA and AMADOR-RAMIREZ talked a number of times on the telephone and ACOSTA provided AMADOR-RAMIREZ with a number of directions and places to go.

45.     On or about January 23, 2015, at approximately 9:55 a.m., MARIO AMADOR-RAMIREZ called ISMAEL JACINTO ACOSTA on the telephone.  During the conversation, ACOSTA stated, "No son, you have to get up already. Because you have to go see this dude at twelve so start getting ready and showering."  AMADOR-RAMIREZ stated, "Hey, uh, and how am I going to do for?   Is the dude coming over here or what's up?   Or where do I go or how, or how are we going to do."  ACOSTA stated, "You don't have your car or what?"  AMADOR-RAMIREZ stated, "Huh?"  ACOSTA stated, "You don't have your car?"  AMADOR-RAMIREZ stated, "Yes, it's here. But, I don't know where to go."  ACOSTA stated, "Oh, then I'll send him over right now.   Just call me when he is there."

46.     On or about January 23, 2015, at approximately 11:19 a.m., MARIO AMADOR-RAMIREZ met with an individual known to the Grand Jury but not indicted herein (hereinafter referred to as T.T.), at ISMAEL JACINTO ACOSTA's direction.

47.     On or about January 23, 2015, MARIO AMADOR-RAMIREZ drove the same silver Chevrolet Silverado pickup truck (with three aftermarket trap compartments), bearing Illinois registration 1658008-B, from Michigan to Ohio.

48.     On or about January 23, 2015, at approximately 3:27 p.m., Ohio State Highway Patrol stopped the same silver Chevrolet Silverado pickup truck (with three aftermarket trap compartments) bearing Illinois registration 1658008-B, driven by MARIO AMADOR-

RAMIREZ traveling southbound on Interstate 280 in Wood County, Ohio.   Inside the vehicle there was a strong odor of deodorizers (commonly used to mask the odor of narcotics). AMADOR-RAMIREZ stated that he did not know the name of the vehicle's owner.   Highway Patrol found three aftermarket "trap" compartments hidden inside the vehicle.   The compartments were empty.

49.     On or about January 23, 2015, at approximately 4:45 p.m., while MARIO AMADOR-RAMIREZ was pulled over, ISMAEL JACINTO ACOSTA called AMADOR-RAMIREZ on the telephone.   AMADOR-RAMIREZ told ACOSTA he was currently stopped by the police.   During the conversation, ACOSTA stated, "Okay, you are not arrested, dude. You understand me?   They just have you there because, because, well everything is, how do you say it?   When you don't speak, I've told you, remember I told you once that, that, in case if anything like this."   AMADOR-RAMIREZ stated, "Yes, yes."   ACOSTA stated, "That you were not going to."   AMADOR-RAMIREZ stated, "Listen, listen to me, listen to me, it's just that they found, they found there [unintelligible]."   ACOSTA asked "What?"   AMADOR-RAMIREZ stated, "They found a battery there, I don't know what."   ACOSTA stated, "Okay, dude. That's fine, you understand me?   You just, bought the truck.   You understand me?   You have the title there, that you just bought it.   You understand me?"   AMADOR-RAMIREZ stated, "Yes, yes."   ACOSTA stated, "You just, you just stay on that, okay?"   AMADOR-RAMIREZ stated, "Okay, [unintelligible]. Okay."   ACOSTA stated, "Hey, another thing." AMADOR-RAMIREZ stated, "Mm?"   ACOSTA stated, "If someone comes, you just, if they handcuff you or whatever you don't answer any question.   You want your lawyer, you want your lawyer, you want your lawyer. I already called him, okay?"

22

50.     On or about January 23, 2015, at approximately 6:34 p.m., MARIO AMADOR-RAMIREZ called ISMAEL JACINTO ACOSTA on the telephone.   During the conversation, AMADOR-RAMIREZ stated, "Nothing, nothing, dude.   Nothing, nothing, and the guy asked what was I, was I doing in Toledo.   I told him, 'no, I'm looking for a job.' [unintelligible] 'looking for a job.' I told him.   And then, he asked me, 'What's up with the truck?' I just bought it, I told him. And that was it.   Then they told me that, that they were going to, what I told you, what happened, what happened was that they already had me since over there to here." ACOSTA stated, "No dude. No, no. No, no it's not that."   AMADOR-RAMIREZ stated, "Then why, [stammers] why is it that they send the dog?"

51.     On or about January 30, 2015, at approximately 2:17 p.m., CS-7 called JONATHAN STEPP on the telephone.   During the conversation, CS-7 stated, "Can I come see you (does STEPP have narcotics available for sale)?   STEPP stated, "What you talking about (STEPP is asking what type of narcotics CS-7 wants)?   CS-7 stated, "Uh, doggie (clarifies that he wants heroin)."   STEPP responded, "Oh yeah, yeah (STEPP confirms he has heroin available.)."   STEPP then told CS-7 that that he wasn't at his house.   CS-7 asked STEPP if he wanted to wait to meet STEPP at his house.   STEPP stated, "What you want (STEPP asked how much heroin)?"   CS-7 stated, "Eight. (eight grams)."   STEPP asked, "Eight of them?"   CS-7 stated, "Yeah."   STEPP then instructed CS-7 to meet him on 65th Street in Cleveland.

52.     On or about January 30, 2015, at approximately 2:43 p.m., JONATHAN STEPP departed his residence, located at 1xxx West 98th Street, Cleveland, Ohio, and drove to the intersection of West 65th Street and Lawn Avenue in Cleveland, Ohio.   STEPP parked in a business parking lot.

53.    On or about January 30, 2015, at approximately 2:46 p.m., CS-7 parked beside JONATHAN STEPP's vehicle.   CS-7 exited his vehicle and entered the rear seat of STEPP's vehicle.   CS-7 then gave STEPP $800.   STEPP provided CS-7 with a small plastic bag containing 7.9 grams of heroin.

54.    On or about January 30, 2015, KELVIN ZAMBRANO and CESAR ZAMBRANO-ESPINAL drove in a tan 2004 Mercury Sable, with an aftermarket trap compartment, registered to E.Z., in Rocky River, Ohio.   The Mercury was stopped by police officers for a traffic stop.

55.    On or about January 30, 2015, at approximately 4:00 p.m., CESAR ZAMBRANO-ESPINAL called ISMAEL JACINTO ACOSTA on the telephone.   During the conversation, ZAMBRANO-ESPINAL stated, "A little, bad.   You know that the police pulled me over."   ACOSTA stated, "Oh."   ZAMBRANO-ESPINAL stated, "But, we were coming back from work and I don't know if, that's why I was calling you to see if you could help me out with, find the lawyer. No, but I'm okay. It's just that one, they took that one because he was driving and his license was expired and he had a warrant from [unintelligible]."   ACOSTA stated, "Oh."   ZAMBRANO-ESPINAL stated, "And I don't, I don't know, I need the lawyer. We were in the little car, but [E.Z.] will take it out."

56.    On or about January 30, 2015, E.Z. picked up the tan 2004 Mercury Sable with the aftermarket "trap" compartment from the Rocky River Impound Lot, and drove it back to the vicinity of 3xxx West 130th Street, Cleveland, Ohio.

57.    At a time subsequent to January 30, 2015, E.Z., at the direction of CESAR ZAMBRANO-ESPINAL, caused the ownership of the tan 2004 Mercury Sable, with an aftermarket "trap compartment" to be transferred to the girlfriend of RYAN MILLER.

24

58.　　On or about January 31, 2015, JOSE HERNANDEZ and JUAN CARLOS SOLIS travelled from the Chicago, Illinois area in a black Lexus GS350, containing multiple aftermarket trap compartments, to 10xxx Loretta Avenue, Cleveland, Ohio, the residence of MARIO AMADOR-RAMIREZ.

59.　　On or about January 31, 2015, at approximately 6:47 p.m., JOSE HERNANDEZ and ISMAEL JACINTO ACOSTA talked on the telephone.　During the conversation, ACOSTA stated that he wanted HERNANDEZ to show an unknown individual a car with an aftermarket trap compartment.　ACOSTA stated, "Mmm, but no, [stammers] it's just that I wanted you to go and explain it to the other guy because this one, you know that this one (AMADOR-RAMIREZ) is not very good at explaining."

60.　　On or about January 31, 2015, at approximately 7:43 p.m., JOSE HERNANDEZ called ISMAEL JACINTO ACOSTA on the telephone.　During the conversation, HERNANDEZ stated, "No, well, That's better, right? That way, show him how was the tire fixed and everything."　ACOSTA stated, "Yes, yes, yes. That's why I'm telling you, but, but, yes, head over there if you want, just call me so I can tell him."　HERNANDEZ stated, "Alright then. That's how we'll do it."　ACOSTA told HERNANDEZ he could head over and wait by "the house", meaning 10xxx Loretta Avenue, Cleveland, Ohio.　ACOSTA asked HERNANDEZ to demonstrate an aftermarket "trap" compartment for ACOSTA's "buddy."

61.　　On or about January 31, 2015, at approximately 8:27 p.m., ISMAEL JACINTO ACOSTA received an incoming call from JOSE HERNANDEZ.　During this call, HERNANDEZ told ACOSTA he was already at the house. ACOSTA replied, "Oh good. Alright then.　As soon as my buddy calls me, I will, I will tell him to, to go see you at Home Depot or something."

62.     On or about the evening of January 31, 2015, JOSE HERNANDEZ and MARIO

AMADOR-RAMIREZ, in two separate vehicles, and others unknown to the Grand Jury, met at a

grocery store parking lot on West 117th Street, Cleveland, Ohio.   One of the vehicles was the

black Lexus GS350, with multiple aftermarket trap compartments.   Another vehicle was a blue

Jeep Cherokee, bearing Ohio license plate GIA6786, also containing multiple aftermarket trap

compartments.   At some point, all of the individuals left in separate vehicles, and the vehicles

that contained JOSE HERNANDEZ and AMADOR-RAMIREZ returned to 10xxx Loretta

Avenue, Cleveland, Ohio.   The black Lexus GS350 did not.

63.     On or about February 2, 2015, at approximately 3:04 p.m., ISMAEL JACINTO

ACOSTA received a text message from CESAR ZAMBRANO-ESPINAL.   The text message

stated, "Do you think I can go pay the gas bill, because I feel like I can spend that?"   At

approximately 3:05 p.m., ACOSTA responded with a text message to stating, "Let me call."   At

approximately 3:14 p.m., ACOSTA sent a second text message stating, "Run over there, they are

waiting for you."

64.     On or about February 2, 2015, at approximately 4:33 p.m., CESAR

ZAMBRANO-ESPINAL went to 10xxx Loretta Avenue, Cleveland, Ohio, in a red Dodge

Caliber, registered to E.Z., and parked in the street in front of 10xxx Loretta Avenue.

ZAMBRANO-ESPINAL exited the passenger seat with a white bag (containing money) in his

left hand, then walked toward the residence.   Approximately fifteen minutes later, CESAR

ZAMBRANO-ESPINAL exited the front door of 10xxx Loretta Avenue, while no longer visibly

carrying a bag.   ZAMBRANO-ESPINAL then entered the passenger seat of the Dodge Caliber.

Shortly thereafter, MARIO AMADOR-RAMIREZ exited 10xxx Loretta Avenue and also

entered the Dodge Caliber.   The Dodge Caliber then departed the residence.   At approximately

26

5:11 p.m., the red Dodge Caliber returned and stopped in the street in front of 10xxx Loretta

Avenue.  MARIO AMADOR-RAMIREZ exited the rear passenger side of the vehicle and

walked into 10xxx Loretta Avenue.  The red Dodge Caliber then departed.

65.    On or about March 6, 2015, at approximately 2:42 p.m., CS-7 called JONATHAN

STEPP on the telephone.  During the conversation, CS-7 asked, "You get any packs in (do you

have any heroin)."  STEPP: stated, "No."  CS-7 stated, "Naw, damn, I need to get, I need like

ten of them things (ten grams of heroin)."  STEPP stated, "Yeah naw, I ain't got shit man."

CS-7 stated, "Man still dry as a motherf**cker?"  STEPP replied, "Yup."  CS-7 asked "Yeah

what's been good with you dog?"  STEPP stated, "Nothing [unintelligible] waiting on CESAR,"

(ZAMBRANO-ESPINAL).  CS-7 stated, "Well shit, I mean you touch down let me know

'cause I need ten grams so shit, I got cash."  STEPP stated, "Alright."

66.    On or about March 6, 2015, RYAN MILLER parked the 2004 Mercury Sable

with the aftermarket "trap" compartment in front of a cellular telephone store in Cleveland, Ohio

with signs in the window that said, "For Sale, RYAN 216 678-6757," and "car is very special,"

and "car has extras."

67.    On or about March 10, 2015, RYAN MILLER told a law enforcement officer,

acting undercover as a potential buyer, that he sold the car.

68.    On or about March 19, 2015, at approximately 11:42 a.m., CS-7 received an

incoming call from JONATHAN STEPP.  During that conversation, CS-7 stated, "What's good

my ni**a?"  STEPP replied, "What's up?"  CS-7 stated, "shit, chillin', about to go take these

two home, you going to be ready today (ready for a narcotic sale)?"  STEPP stated, "Yeah, I got

some, I got some girl (cocaine) right now, about to call my dude for some more, (call to obtain

heroin) what?"  CS-7 stated, "I wanna, I was seeing if you had ten tickets, (10 grams of heroin)

27

I'd come get." STEPP: stated, "Yeah." CS-7 stated, "Alright, um, I'm going to drop them off and then shit, I'll come see you, you going to be at your house?" STEPP stated, "No, just call me, I won't probably." CS-7 stated, "Alright for sure." STEPP stated, "Alright."

69. On or about March 19, 2015, at approximately 11:48 a.m., JONATHAN STEPP received an incoming call from CESAR ZAMBRANO-ESPINAL with a duration of approximately seven seconds. Shortly thereafter, STEPP placed an outgoing call to CESAR ZAMBRANO-ESPINAL with a duration of approximately 22 seconds.

70. On or about March 19, 2015, CS-7 called JONATHAN STEPP. During the conversation, CS-7 stated, "Shit. You ready?" STEPP stated, "Yeah, I'll be right here. . . I am going to see my dude (meet supplier to obtain heroin) real quick and I am probably going back over to Belinda's and Jay's house." CS-7 stated, "Alright, so you just want me to meet you at Jay's house in what like 30 minutes or something?" STEPP replied, "Yeah."

71. On or about March 19, 2015, at approximately 12:59 p.m., JONATHAN STEPP placed an unanswered call to CESAR ZAMBRANO-ESPINAL. At approximately 1:00 p.m., CESAR ZAMBRANO-ESPINAL placed an outgoing call to STEPP's phone with a duration of approximately 27 seconds.

72. On or about March 19, 2015, at approximately 12:59 p.m., JONATHAN STEPP drove a blue 2002 Chevrolet Tahoe and pulled into a driveway located at 3xxx West 130th Street, Cleveland, Ohio, two houses north of CESAR ZAMBRANO-ESPINAL's house.

73. On or about March 19, 2015, at approximately 1:04 p.m., CESAR ZAMBRANO-ESPINAL walked from his residence and entered the same driveway that JONATHAN STEPP pulled into driving blue 2002 Chevrolet Tahoe. At this time, ZAMBRANO-ESPINAL supplied STEPP with a quantity of heroin.

28

74.     On or about March 19, 2015, at approximately 1:10 p.m., CESAR ZAMBRANO-ESPINAL walked down the driveway of 3xxx West 130th Street and walked south on the sidewalk toward his residence.   At or about the same time, the blue Chevrolet Tahoe driven by JONATHAN STEPP backed from the driveway, traveled southbound on West 130th Street and traveled to 4xxx West 20th Street, Cleveland, Ohio.

75.     On or about March 19, 2015, at approximately 1:26 p.m., in the Northern District of Ohio, JONATHAN STEPP sold CS-7 approximately 10 grams of heroin packaged in the same kind of packaging material found in prior trash pulls from CESAR ZAMBRANO-ESPINAL's residence.

76.     On or about April 3, 2015, JONATHAN STEPP possessed heroin.

77.     On or about April 4, 2015, at approximately 8:12 p.m., REINALDO HERNANDEZ called CESAR ZAMBRANO-ESPINAL on the telephone.   During part of the conversation, HERNANDEZ stated, "Everything okay. Look, I'm about to be done." ZAMBRANO-ESPINAL stated, "That's good." HERNANDEZ stated, "In like, in like about forty minutes, I'm going to call again to, to come up there . . . money (pay for narcotics) and get the other one (receive more narcotics), alright?"   ZAMBRANO-ESPINAL stated, "Alright, that's set."   HERNANDEZ stated, "Are you, you are going to make it the same (same purity and amount) as the first one, right? Are you."   ZAMBRANO-ESPINAL stated, "Yes. Yes, don't worry. You already know."

78.     On or about April 4, 2015, between approximately 8:36 p.m. and 9:01 p.m., CESAR ZAMBRANO-ESPINAL and REINALDO HERNANDEZ exchanged a series of text messages and phone calls on arranging a meeting.   At approximately 9:01 p.m., HERNANDEZ and ZAMBRANO-ESPINAL spoke on the telephone.   During the conversation, HERNANDEZ

told ZAMBRANO-ESPINAL that he went too far and he was flashing his lights. At approximately 9:04 p.m., during another phone call, ZAMBRANO-ESPINAL warned HERNANDEZ that he has a headlight out and he was just telling him so that the cops wouldn't pull him over because of that. ZAMBRANO-ESPINAL met HERNANDEZ sometime between approximately 9:01 p.m. and 9:04 p.m. and distributed cocaine to him.

79.     On or about April 5, 2015, at approximately 1:38 p.m., REINALDO HERNANDEZ sent CESAR ZAMBRANO-ESPINAL a text message. The text message stated, "Cesario that pepe the powder (cocaine distributed to him the previous day) is cut the powder is no good."

80.     On or about April 5, 2015, at approximately 1:54 p.m., CESAR ZAMBRANO-ESPINAL called REINALDO HERNANDEZ on the telephone. During the conversation, HERNANDEZ stated, "Uh-huh. Look, I was just checking that out right now, but that powder that was under, it was loose. . . The [Unintelligible] is good. But, I don't know if the powder has something or I don't know what because no, no I don't want this shit like this." ZAMBRANO-ESPINAL stated, "No, but I saw it when they took it out. I saw when they took it out and it's the same. I don't know what's up." HERNANDEZ stated, "Uh-huh?" ZAMBRANO-ESPINAL stated, "Yes, for real. I even went for it." HERNANDEZ stated, "Uh, because [stammers] I grabbed it there and I quickly checked it out just now because, I was going to cook it. So, to sell it like that, cooked." ZAMBRANO-ESPINAL stated, "Mm-hum." HERNANDEZ stated, "And, it was, the powder was kind of weird but the rock was good. But it's not much powder, what it has is like, like [stammers] if the rock was like that, like [stammers] half gram of little powder. Everything, everything was hard but it was very little powder, it wasn't too much." ZAMBRANO-ESPINAL stated, "No, well I watched."

30

HERNANDEZ stated, "It was half gram of little powder what was there." ZAMBRANO-ESPINAL stated, "Yes, I even watched when they were, I went over for it, you understand me? I came by for it and they ..." HERNANDEZ stated, "Uh-huh." ZAMBRANO-ESPINAL stated, "Took it out, but I don't know why, but for real, it is the same for real."

81. On or about April 9, 2015, an individual known to the Grand Jury but not indicted herein (hereinafter referred to as R.W.), called CESAR ZAMBRANO-ESPINAL on the telephone. During the conversation, R.W. stated, "I text you about, fifteen, twenty minutes ago. I uh, have (money for narcotics transaction) it for you." ZAMBRANO-ESPINAL stated, "Okay."

82. On or about April 9, 2015, at approximately 12:30 p.m., MARIO AMADOR-RAMIREZ called CESAR ZAMBRANO-ESPINAL on the telephone. During the conversation, AMADOR-RAMIREZ stated, "No, it's just that this man (ACOSTA) is not answering me and uh, he wants me to send him the, but I don't complete, and I wanted to see if you could support/help out or what was he going to do. I don't know, he is not answering me." ZAMBRANO-ESPINAL stated, "No, no, no, not right now. I am really tired right now." AMADOR-RAMIREZ stated, "But it's not too much." ZAMBRANO-ESPINAL stated, "Oh no?" RAMIREZ stated, "No! It's very little." ZAMBRANO-ESPINAL replied, "No, well but, [stammers] I am not there right now. . . Uh, nothing, if you want, I could call you. For what time was the deal?" AMADOR-RAMIREZ stated, "Well, I don't know. I don't know, it's just that, I don't know, the guy is not answering me. . . See what's up, if [stammers] it's not a lot, it's not a lot, there's only, there's only three." ZAMBRANO-ESPINAL stated, "Three. . . ?" AMADOR-RAMIREZ stated, "Yes. It's not a lot." ZAMBRANO-ESPINAL stated, "Oh well, yes. For that yes, there's no problem."

31

83.     On or about April 9, 2015, at approximately 12:44 p.m., CESAR ZAMBRANO-ESPINAL and MARIO AMADOR-RAMIREZ spoke on the telephone again.  During this call, ZAMBRANO-ESPINAL told AMADOR-RAMIREZ, "If you want come by and bring me the, the, the copy, just like you do it.  Let's see what's up.  How you keep it written down, like me.  To see if it goes the same (help me send money to ISMAEL JACINTO ACOSTA)."

84.     On or about April 9, 2015, after the two aforementioned calls, MARIO AMADOR-RAMIREZ departed 10xxx Loretta Avenue, Cleveland, Ohio, and drove to ZAMBRANO-ESPINAL's residence at 3xxx West 130th Street, Cleveland, Ohio.  AMADOR-RAMIREZ then returned to 10xxx Loretta Avenue for a short time, then traveled to an "Ace Cash Express" store and a PNC bank branch.  RAMIREZ made a deposit of $3,000 in cash and money orders in narcotics proceeds to an account associated with ACOSTA.

85.     On or about April 10, 2015, at approximately 8:44 p.m., CESAR ZAMBRANO-ESPINAL called JONATHAN STEPP on the telephone.  During the conversation, STEPP stated, "What's up buddy?"  ZAMBRANO responded, "What's happening bro?"  STEPP stated, "Shit, I just got up."  ZAMBRANO stated, "You okay?"  STEPP stated, "Yeah, there is no news?"  ZAMBRANO stated, "Are you ready (for a drug transaction)?"  STEPP stated, "Yeah."  ZAMBRANO stated, "Give me ten (10) minutes. I call you, I call you."  STEPP stated, "Thank you."

86.     On or about April 10, 2015, at approximately 8:57 p.m., CESAR ZAMBRANO-ESPINAL called JONATHAN STEPP on the telephone.  During the conversation, ZAMBRANO-ESPINAL asked STEPP if STEPP was coming and STEPP answered he was.

87.     Immediately after placing that call, CESAR ZAMBRANO-ESPINAL called KELVIN ZAMBRANO on the telephone.  During the conversation, ZAMBRANO-ESPINAL

and KELVIN ZAMBRANO talked in code. KELVIN ZAMBRANO asked, "Do you want the FIFA game from two thousand one or two thousand two?" CESAR ZAMBRANO-ESPINAL responded, "From two thousand one, uh." KELVIN ZAMBRANO stated, "Alright then." CESAR ZAMBRANO-ESPINAL responded, "Alright." KELVIN ZAMBRANO stated, "Do I see you there or. . . ?" CESAR ZAMBRANO-ESPINAL stated, "No, here, bring it (the narcotics) here." KELVIN ZAMBRANO stated, "Alright then." CESAR ZAMBRANO-ESPINAL stated, "Alright, we play it here."

88. On or about April 10, 2015, at approximately 9:09 p.m., KELVIN ZAMBRANO was a passenger in a blue four-door Mazda 6 as it pulled into the driveway of 3xxx West 130th Street, Cleveland, Ohio. KELVIN ZAMBRANO exited the vehicle and delivered a quantity of narcotics to CESAR ZAMBRANO-ESPINAL.

89. On or about April 10, 2015, at approximately 9:18 p.m., JONATHAN STEPP drove a blue Chevrolet Tahoe, parked and exited the vehicle, and entered the residence located at 3xxx West 130th Street.

90. On or about April 11, 2015, JAMES CARVER, via Western Union, sent J.T. (the same J.T. that OCTAVIO RODRIGO sent money to via MoneyGram) $1,875 in narcotics proceeds. The listed phone number for J.T. on the Western Union money order was a Mexican phone number.

91. On or about April 11, 2015, at approximately 1:53 p.m., CESAR ZAMBRANO-ESPINAL called KELVIN ZAMBRANO on the telephone. During this conversation, CESAR ZAMBRANO-ESPINAL and KELVIN ZAMBRANO talked in code. CESAR ZAMBRANO-ESPINAL stated, "What was I going to tell you, uh, the, Chela's friend is going to play, he's got a game/match today there and I don't know if you wanted to bring him the goal keeper's jersey

33

(narcotics) with the number one." KELVIN ZAMBRANO acknowledged and stated that he will take 10-15 minutes. CESAR ZAMBRANO-ESPINAL asked KELVIN ZAMBRANO to call when he leaves so CESAR ZAMBRANO-ESPINAL can let the friend know that he is coming (with the drugs).

92. On or about April 11, 2015, at approximately 2:27 p.m., CESAR ZAMBRANO-ESPINAL called KELVIN ZAMBRANO on the telephone. During the conversation, CESAR ZAMBRANO-ESPINAL asked KELVIN ZAMBRANO if he had left yet. KELVIN ZAMBRANO told CESAR ZAMBRANO-ESPINAL that he would be there in two minutes. CESAR ZAMBRANO-ESPINAL stated, "That's fine, no problem. I'll see you there. Set aside the other one, (another quantity of narcotics) remember?"

93. On or about April 11, 2015, at approximately 2:29 p.m., KELVIN ZAMBRANO drove the blue 2004 Mazda 6, Ohio registration GIA5769, to 3xxx West 134th Street, Cleveland, Ohio. ZAMBRANO pulled into the driveway of the residence and parked behind a silver van and distributed a quantity of narcotics to R.W.

94. On or about April 23, 2015, MANUEL MALDONADO, via Western Union, sent an individual known to the Grand Jury but not charged herein (hereinafter referred to as D.T.L.) $1,000 in narcotics proceeds. The listed phone number for D.T.L. on the Western Union money order was the same Mexican phone number as the number listed on the money orders sent to M.Q., also from MALDONADO.

95. On or about May 13, 2015, at approximately 11:30 a.m., a gold Chevrolet Equinox was parked at ISMAEL JACINTO ACOSTA's residence, located at 3xxx East Overlook Road, Cleveland Heights, Ohio. At approximately 11:33 a.m., a dark blue 2005 Jeep Grand Cherokee Ohio License plate GIA6786, with an aftermarket trap compartment registered

34

to a person known by the Grand Jury but not indicted herein (hereinafter referred to as S.C.), pulled into and parked in the driveway of ACOSTA's residence. VAN HERRON exited the driver's seat of the Jeep Grand Cherokee, crawled into the backseat for a short time, and walked toward the rear of the residence, where he was met by ACOSTA. ACOSTA had a gray plastic bag in his hand. The bag appeared to contain several square or rectangular shaped objects. ACOSTA walked with the bag to the rear passenger-side door of the Jeep Grand Cherokee. ACOSTA opened the door and leaned into the back seat area of the vehicle (placing the item in the trap compartment). ACOSTA then closed the door of the vehicle, and walked to the rear of the residence carrying a balled up plastic bag in his hand. ACOSTA opened the rear hatch of the Chevrolet Equinox while wearing a blue rubber glove on his hand. Shortly thereafter, ACOSTA walked from the rear of the Chevrolet Equinox to the Jeep Grand Cherokee while carrying in his hand a gray plastic bag, containing a single square or rectangular shaped object. ACOSTA leaned into the back seat area of the Jeep Grand Cherokee. ACOSTA then walked to the rear of the residence with nothing in his hand. HERRON spoke briefly with ACOSTA, and then HERRON drove away in the blue Jeep Grand Cherokee.

96. On or about June 11, 2015, S.C. drove the same dark blue 2005 Jeep Grand Cherokee, bearing Ohio license plate GIA6786, registered to him/her. Inside were three kilograms of heroin hidden in an aftermarket "trap" compartment on the floor of the rear cargo area.

97. On or about June 17, 2015, TENNILLE BRYANT, via Western Union, sent an individual known to the Grand Jury but not charged herein (hereinafter referred to as F.T.) $2,000 in narcotics proceeds. The listed phone number for F.T. on the Western Union money order was a Mexican phone number.

98.     On or about July 5, 2015, MANUEL MALDONADO transferred narcotics proceeds in the amount of $2,500 via Western Union to M.Q. at the direction of ALFONSO RODRIGO.   M.Q. listed the same number on the money order as D.T.L.

99.     On or about August 3, 2015, ALFONSO RODRIGO transferred narcotics proceeds in the amount of $2,000 via Western Union to J.T., the same individual to whom JAMES CARVER sent at least one money order.

100.    On or about August 19, 2015, ALFONSO RODRIGO was introduced to a confidential informant (hereinafter referred to as CS-1) by MAURICE WALKER, aka CAL, at a bar in Cleveland, Ohio.   ALFONSO RODRIGO engaged in a narcotics related conversation with CS-1 and gave him/her his phone number.   RODRIGO told CS-1 that he had been out of business selling kilogram levels of cocaine for the past six months, but was now getting back into selling narcotics.   RODRIGO told CS-1 that his source of supply is in California. RODRIGO said that he had recently been involved in a drug case, but "got lucky" and had received probation.   RODRIGO said he had lived in Cleveland, Ohio for 10 years.   RODRIGO said he owned a restaurant called "Rodrigo's."   RODRIGO said he was originally from Madera, California. RODRIGO asked CS-1 to supply him with cocaine for a short time until RODRIGO could make contact with his source of supply again in California.   RODRIGO was traveling to California shortly after August 19, 2015 to re-establish his relationship with the supplier. RODRIGO stated that he had been paying $33,000 per kilogram of cocaine before his arrest and probation.   RODRIGO stated that he had sold up to 30 kilograms of narcotics at a time. RODRIGO stated that he could make that sale in one day, but it would never take longer than a week.   RODRIGO said that he only works with a few very good people that he trusts fully. RODRIGO stated that his source from California transports the kilograms of narcotics that he is

36

purchasing to Kansas City.   RODRIGO then made arrangements for the transport from Kansas City to Cleveland, Ohio.

101.   On or about August 24, 2015, ALFONSO RODRIGO called CS-1.   During the conversation, RODRIGO asked to meet soon with CS-1 to discuss purchasing narcotics.

102.   On or about August 27, 2015, at approximately 8:10 p.m., CS-1 called ALFONSO RODRIGO on the telephone.   During the conversation, CS-1 told RODRIGO that CS-1 would meet him at a bar on West 6th Street in Cleveland, Ohio at 10:00 p.m.

103.   On or about August 27, 2015, in the evening, ALFONSO RODRIGO met CS-1 inside a bar on West 6th Street in Cleveland, Ohio, and engaged in a lengthy conversation about trafficking narcotics.   RODRIGO claimed to have been "clean" for a year and stated that he had been out of the business of selling narcotics for a year.   RODRIGO explained that the only time he goes to downtown Cleveland were when his "boys" are in town.   RODRIGO said he doesn't "f**k with anything in the city" and that he stays home.   RODRIGO made it clear that he was there to arrange business with CS-1, stating he was not there to "just kick it."   RODRIGO estimated he makes about $30,000 - $40,000 per month from drug trafficking.   RODRIGO said that he had "China White" (heroin).   RODRIGO said that this was the "weakest shit" he had in a while.   RODRIGO explained that the "China White" was heroin mixed with fentanyl. RODRIGO stated, "They use fentanyl to make it."   RODRIGO continued to hawk his narcotics, saying, "You can make one and a half out of it, and still make money."   RODRIGO stated, "My boy that passed away (a person known to Grand Jury but not indicted herein (hereinafter referred to as C.R.), who overdosed on heroin)?   No bullshit.   He made, it seemed like he made money doing nothing."   RODRIGO stated that C.R. made $45,000 in one month.   RODRIGO stated that C.R. had access to as much narcotics as he wanted.   RODRIGO asked CS-1 if he/she

37

wanted a sample, and CS-1 replied in the affirmative.   RODRIGO said, "I'll get you like a gram, two grams just to put out there."   RODRIGO then placed a call to an unidentified associate and asked the associate to bring "two g's from 7-11 (two grams of heroin from the stash location)."

104.   During the above described meeting, from between 9:52 p.m. and 11:27 p.m., ALFONSO RODRIGO called MAURICE WALKER, aka CAL three times.   During this meeting, RODRIGO also received an incoming call from WALKER.

105.   During the above described meeting, ALFONSO RODRIGO went further and explained the inner workings of his drug trafficking activity.   RODRIGO claimed that he was the one who set everything up, the customers, the supply, the vehicles to deliver the heroin, all referred to in code as "the work."   RODRIGO told CS-1 that he did not pay his workers on commission.   RODRIGO said he viewed his workers as just that, workers.   RODRIGO stated that no one person does the whole job, and that each job within the operation is compartmentalized, one person handles the cars, a different worker counts money, another worker handles the deliveries, etc.   RODRIGO claimed that the workers who deliver the "work" (heroin) get paid based on how much "work" is delivered.   Workers who guard the "work" get paid $100 per brick (kilogram of heroin).   RODRIGO further described the difficulties of running the operation.   RODRIGO stated, "I've been in this game too long, if you don't set prices from the beginning, then everyone wants in on it.   They don't know the pay scale's different.   They don't know that I gotta pay rent.   You know what I mean?   Drivers.   Food.   You know what I mean?   They don't know that shit."   RODRIGO continued: "Oh yeah. When I talk my number, my number is five. Whatever I got going on over here, anything before them, they got nothing to do with it.   I tell them the number from Miami (Florida) out.   Because I

38

don't wanna get caught in a lie.  You know what I mean?  But they don't know what happens from here (Cleveland) back."  RODRIGO stated that all his people who work for him have said that he is the highest paying guy.  RODRIGO and CS-1 then briefly argued about speaking too much in front of the workers.  RODRIGO stated that it didn't matter to him because at the end of the day he knew that he could move more weight (kilograms of product) than anyone. RODRIGO said his narcotics supplier(s) would be loyal to him because of that.  RODRIGO bragged to CS-1 that he found out "they" (law enforcement) just busted a ring of cocaine with 50 kilos and 10 kilos of heroin which were being brought into Cleveland.  RODRIGO said that he laughed when he heard this, because he does that kind of volume by himself.  RODRIGO stated, "That means that we're the biggest, I have no worries."  RODRIGO elaborated that he had been in Cleveland, Ohio for 10 years.  RODRIGO stated that he personally built up his business.  RODRIGO claimed that he was dealing with "old school dudes, 40, 50-year-old hustlers."  RODRIGO said that he never runs out of product.  RODRIGO also stated that "I always like to have my doors open" in case he needs a new supplier.  RODRIGO talked about how "they" (law enforcement) found a kilo of heroin, $60,000 cash, and a dead body (C.R) in the house which he referred to as his "office."  RODRIGO estimated he was already out $80,000 for the kilogram of heroin and the $60,000 cash seized.  RODRIGO claimed that his "buy in" for that load of heroin was half a million dollars.  RODRIGO explained that he had the best lawyer (who also represented ISMAEL JACINTO ACOSTA), that he hadn't been inside the house when the police found C.R.'s body, and claimed that RODRIGO's prints and DNA weren't in the house.  RODRIGO stated that his "dude" looks out for him also.  RODRIGO also claimed he had a guy in Washington, D.C. that owes RODRIGO $100,000 right now, but is paying it off in installments.  RODRIGO stated he was a "Nortenos 14" gang member

39

(Nortenos 14 is a Northern California street gang that has ties to the Sinaloa Cartel).
RODRIGO stated as soon as "we fix what we gotta fix" (trafficking heroin resumes), CS-1 will
be told to call "CAL (MAURICE WALKER)."  RODRIGO said that CAL works for him,
knows where RODRIGO's "office" is, knows the "codes," "knows where to get it."
RODRIGO stated that a code would be used.  RODRIGO stated that he will switch phones and
will give the new number to CS-1 when he gets it.  RODRIGO stated that he had nine phones
currently active.  RODRIGO stated that he used an Arab connect (supplier) for all his phones.
RODRIGO stated that the Arab works at a Sunoco station and doesn't ask any questions.
RODRIGO told CS-1 that when he moved to Phoenix, Arizona, the drug business got easier.
During the conversation, RODRIGO greeted ISMAEL JACINTO ACOSTA as he walked into
the bar.  RODRIGO stated, "See that mother**ker right there (pointing to ACOSTA)?  We do
numbers (we sell a lot of heroin)."  RODRIGO stated that ACOSTA was his best friend, but
that they "worked" independently of each other.  RODRIGO stated "never confuse friendship
with work."  ACOSTA was present for much of the ensuing conversation.

106.    Later in the same evening, on August 28, 2015, at approximately 12:25 a.m.,
ALFONSO RODRIGO received an incoming telephone call from MAURICE WALKER, aka
CAL.  Shortly thereafter, WALKER arrived and delivered 3.5 grams of heroin as a sample to
RODRIGO while still at the bar.  RODRIGO admonished WALKER for being late.  WALKER
gave the heroin to RODRIGO, who in turn handed the heroin to CS-1.  RODRIGO stated that
the heroin was a sample, and "you can't step on it (dilute the heroin with non-narcotics
substances, or "cut" to stretch it) and expect it to work."

107.    On or about September 22, 2015, ALFONSO RODRIGO met with CS-1 for a
previously arranged meeting at a downtown bar to talk about buying a trap car (car with an

40

aftermarket hidden compartment) and future narcotics transactions. RODRIGO called and stated he was on his way to the meeting. During the meeting, RODRIGO agreed to sell CS-1 heroin the following day. RODRIGO introduced CS-1 to another DTO member, a large Hispanic male with a prominent neck tattoo whom RODRIGO introduced as "DAVID," later identified as DAVID URRABAZO-MALDONADO, JR.

108.   On or about September 23, 2015, ALFONSO RODRIGO and CS-1 engaged in a series of telephone calls arranging the place and time for the purchase of heroin. At approximately 5:19 p.m., RODRIGO advised that he was busy with his family (children could be heard playing in RODRIGO's background). RODRIGO then stated that he would have to have "somebody just take a cab over there," and that he would call CS-1 back. At approximately 6:29 p.m., RODRIGO called CS-1 and asked if CS-1 would be willing to drive "my boy" downtown so "his boy" would be able to catch a cab back to RODRIGO. CS-1 offered to meet "his boy" at the Steelyard Commons shopping center in Cleveland. CS-1 stated, "So, who's coming, are you sending CAL (MAURICE WALKER) or what?" RODRIGO replied, "No it's not CAL it's the dude from yesterday," (DAVID URRABAZO-MALDONADO, JR.). RODRIGO said he was finishing up something and was dropping his kids off at the house.

109.   On or about September 23, 2015, at approximately 6:35 p.m., ALFONSO RODRIGO called CS-1 on the telephone. During the conversation, RODRIGO stated that he was already at the Steelyard Commons. CS-1 responded, "Give me 30 minutes," then asked RODRIGO, "are you gonna drop him off then?" RODRIGO said, "Uh, I don't know yet, I'll be there."

110.   On or about September 23, 2015, at approximately 7:00 pm, ALFONSO RODRIGO, driving a black Lincoln Navigator SUV, dropped off DAVID URRABAZO-

MALDONADO, JR., who was wearing a mechanic's shirt, at the Applebee's restaurant located in the Steelyard Commons plaza. RODRIGO then drove the Navigator across the parking lot to meet CS-1. Once CS-1 and RODRIGO were parked adjacent to each other, CS-1 entered the black Lincoln Navigator in which RODRIGO was sitting. RODRIGO stated that he did not have "it," (four ounces of heroin) but that "it" was "here." CS-1 then told RODRIGO that CS-1 had a "dude" that was holding the buy money. Together they agreed that each of their respective "associates" would meet and do the exchange. CS-1's "associate" was an undercover DEA agent driving a black pickup truck. RODRIGO gave CS-1 a description of URRABAZO-MALDONADO, JR. RODRIGO received an incoming telephone call from URRABAZO-MALDONADO, JR., and RODRIGO instructed him to get in the truck with CS-1's "associate" and do the transaction. URRABAZO-MALDONADO, JR., then entered the truck occupied by the DEA undercover agent. URRABAZO-MALDONADO, JR., gave the DEA undercover agent a plastic bag containing approximately four ounces of heroin in exchange for $9,000.00.

111.    Shortly thereafter, DAVID URRABAZO-MALDONADO, JR., took the black bag of money to the black Lincoln Navigator and ALFONSO RODRIGO. URRABAZO-MALDONADO, JR., and RODRIGO traveled together in the black Lincoln Navigator to 18xxx Maple Heights Boulevard, an address used by RODRIGO and OCTAVIO RODRIGO, and owned by an individual known as M.F., arriving at approximately 7:30 p.m.

112.    On or about October 17, 2015, MANUEL MALDONADO transferred narcotics proceeds in the amount of $1,800 via MoneyGram to D.T.L, at the direction of ALFONSO RODRIGO.

113.    On or about November 9, 2015, MARIO AMADOR-RAMIREZ drove a gold 2006 Chevrolet Equinox, Ohio license plate number GGV1129, from 10xxx Loretta Avenue, Cleveland, Ohio, the residence of AMADOR-RAMIREZ, to the area of 2xxx East 22nd Street, Cleveland, Ohio, and parked the vehicle in the parking garage of the Stephanie Tubbs Jones Transit Center, 2xxx East 22nd Street, Cleveland, Ohio.   The location is a Cleveland RTA transit station as well as the Cleveland commercial bus line pick up and drop off location.

114.    On or about November 9, 2015 at approximately 2:40 p.m., ISMAEL JACINTO ACOSTA drove a black 2016 GMC Yukon bearing Ohio registration GAQ8582 to 10xxx Loretta Avenue, Cleveland, Ohio.   ACOSTA exited the vehicle and walked through a wooden gate.   At approximately 2:49 p.m., ACOSTA walked back through the wooden gate returning to the GMC Yukon and left the residence.

115.    On or about November 9, 2015, at approximately 3:22 p.m., ISMAEL JACINTO ACOSTA returned to 10xxx Loretta Avenue residence in the GMC Yukon.   ACOSTA exited the vehicle carrying a brown bag and entered the residence utilizing a key to enter through the front door.   At approximately 3:41 p.m., ACOSTA exited the residence and left the location in the black GMC Yukon.

116.    On or about November 10, 2015, at approximately 8:25 a.m., MARIO AMADOR-RAMIREZ exited the commercial bus in Cleveland Ohio carrying a black and gray backpack that contained narcotics or narcotics proceeds over his shoulder.   AMADOR-RAMIREZ walked to the gold 2006 Chevrolet Equinox, which was parked on the ground level of the parking garage.   AMADOR-RAMIREZ placed the backpack in the rear cargo area of the vehicle, entered the driver's seat, and left the location.

43

117.    On or about November 10, 2015, at approximately 8:42 a.m., MARIO
AMADOR-RAMIREZ, driving the gold 2006 Chevrolet Equinox, pulled into the driveway of
10xxx Loretta Avenue, Cleveland, Ohio.    AMADOR-RAMIREZ exited the vehicle and walked
toward the wooden gate.    At approximately 8:45 a.m., AMADOR-RAMIREZ returned to the
Chevrolet Equinox and left the residence.

118.    On or about November 10, 2015, MARIO AMADOR-RAMIREZ drove the
Equinox to 3xxx East Overlook Road, Cleveland Heights, Ohio, the residence of ISMAEL
JACINTO ACOSTA, arriving at approximately 9:35 a.m.

119.    On or about November 10, 2015, at approximately 9:38 a.m., MARIO
AMADOR-RAMIREZ backed the Chevrolet Equinox into the driveway and parked the vehicle.
AMADOR-RAMIREZ exited the vehicle, and opened the rear hatch.    AMADOR-RAMIREZ
removed an item from the vehicle and placed it behind the residence and out of view of law
enforcement surveillance.

120.    On or about November 10, 2015, at approximately 9:44 a.m., MARIO
AMADOR-RAMIREZ walked back to the open hatch area of the vehicle carrying a white bag
with handles.    At approximately 9:47 a.m., AMADOR-RAMIREZ closed the hatch of the
vehicle.

121.    On or about November 10, 2015, at approximately 12:14 p.m., ISMAEL
JACINTO ACOSTA appeared from behind the residence and entered the driver seat of a black
GMC Yukon that was parked directly behind the Chevrolet Equinox.    MARIO AMADOR-
RAMIREZ walked to the driver's door of the Chevrolet Equinox.    ACOSTA exited the GMC
Yukon and walked to the passenger side front door of the Chevrolet Equinox as AMADOR-
RAMIREZ opened the driver's door and activated the vehicles headlights (which activated the

44

access to an aftermarket trap compartment).  AMADOR-RAMIREZ then walked to and opened

the rear hatch of the vehicle as ACOSTA returned to and opened the driver door of the GMC

Yukon.  ACOSTA reached into the GMC Yukon and then walked behind the residence.  At

approximately 12:17 p.m., AMADOR-RAMIREZ closed the hatch of the Chevrolet Equinox and

walked behind the residence.  At approximately 12:18 p.m., ACOSTA and AMADOR-

RAMIREZ moved the GMC Yukon and the Chevrolet Equinox from the driveway.  At

approximately 12:22 p.m., ACOSTA and AMADOR-RAMIREZ walked from the street to the

back of the residence.

122.    On or about November 10, 2015, at approximately 3:00 p.m., ALFONSO

RODRIGO drove a black 1998 Ford Expedition and pulled into the driveway of the residence.

The black Ford Expedition stopped near the detached garage and immediately backed out of the

driveway followed by the 2015 white Chevrolet Suburban.  On or about November 10, 2015, at

approximately 3:02 p.m., ALFONSO RODRIGO exited the black 1998 Ford Expedition and

walked up the driveway from the street.

123.    On or about November 10, 2015, at approximately 3:09 p.m., MARIO

AMADOR-RAMIREZ walked from the back of the residence to the street.  AMADOR-

RAMIREZ entered the 2006 gold Chevrolet Equinox and backed it into the driveway and parked

near the back of the residence and AMADOR-RAMIREZ exited the vehicle and walked behind

the residence.  The rear hatch of the vehicle had been opened and the headlights of the vehicle

remained on after being parked.

124.    On or about November 10, 2015, at approximately 3:13 p.m., MARIO

AMADOR-RAMIREZ carried two white kitchen trash bags in his right hand.  The white trash

bags appeared to contained square brick shaped objects.

125.    On or about November 10, 2015, at approximately 3:15 p.m., MARIO AMADOR-RAMIREZ walked toward the street.   ISMAEL JACINTO ACOSTA walked to the open hatch of the Chevrolet Equinox.   ACOSTA looked into the open hatch of the vehicle and then walked behind the residence.   At approximately 3:17 p.m. AMADOR-RAMIREZ walked from the open rear hatch to the back of the residence empty handed.

126.    On or about November 10, 2015, at approximately 3:19 p.m., MARIO AMADOR-RAMIREZ returned to the open rear hatch of the Chevrolet Equinox.   At approximately 3:23 p.m. AMADOR-RAMIREZ walked to and opened the rear passenger side door of the Chevrolet Equinox.   AMADOR-RAMIREZ was wearing white rubber gloves. AMADOR-RAMIREZ reached into the back seat area of the vehicle and went back and forth from the back door to the open rear hatch.   ISMAEL JACINTO ACOSTA appeared at the open rear hatch of the vehicle.   ACOSTA stood there briefly before returning to the back of the residence.

127.    On or about November 10, 2015, at approximately 3:25 p.m., MARIO AMADOR-RAMIREZ, still wearing the rubber gloves, closed the back door and the hatch of the vehicle.   At approximately 3:28 p.m., AMADOR-RAMIREZ entered the Chevrolet Equinox and left the residence.

128.    On or about November 23, 2015, at approximately 1:45 p.m., ALFONSO RODRIGO called DAVID URRABAZO-MALDONADO, JR.   URRABAZO-MALDONADO, JR., answered the telephone and spoke briefly, then passed the telephone to OCTAVIO RODRIGO.   During the conversation, ALFONSO RODRIGO and OCTAVIO RODRIGO discussed how much money to pay their supplier for narcotics and transportation expenses. ALFONSO RODRIGO stated, "What's up?   What you doing?"   OCTAVIO RODRIGO stated,

"The other [Unintelligible] here."   ALFONSO RODRIGO stated, "What?   Is it there yet?"
OCTAVIO RODRIGO stated, "No, but it won't take long. [pause] Hey, what are we going to do?
With the [coughs]."   ALFONSO RODRIGO stated, "We have that there. I think you
[stammers] only give like 30.   30, 35 only."   OCTAVIO RODRIGO stated, "Yeah?"
ALFONSO RODRIGO stated, "Yeah."   OCTAVIO RODRIGO stated, "Then I was talking to
Martin and [Unintelligible]."   ALFONSO RODRIGO stated, "I don't have any more to give,
anyways, Dad."   OCTAVIO RODRIGO stated, "But."   ALFONSO RODRIGO stated, "That
money is not mine."   OCTAVIO RODRIGO stated, "Well, then I'm going to tell them that,
well, we have to go away and until we come back we can give them the rest of what they are
asking for."   ALFONSO RODRIGO stated, "Tell them that's what we have until now, that the
taxi is just going out, that's it."   OCTAVIO RODRIGO stated, "Okay."   ALFONSO RODRIGO
stated, "There are 30 tell him. There are 30. And they can wait for, but I don't want them to wait
for Saturday, or he's going to see that there is more."   OCTAVIO RODRIGO stated, "Let see if
it comes [Unintelligible]."   ALFONSO RODRIGO stated, "We are going to give him 36 and
that's it."   OCTAVIO RODRIGO stated, "[Unintelligible], Okay.   Alright then, bye."

129.   On or about November 23, 2015, at approximately 4:25 p.m., OCTAVIO
RODRIGO called ALFONSO RODRIGO on the telephone.   During the conversation, they
discussed that their supplier was sending them more of the "dark ones," meaning a specific type
of narcotics.   ALFONSO RODRIGO and OCTAVIO RODRIGO were complaining that they
already had a large amount of narcotics they needed to sell.

130.   On or about November 23, 2015, at approximately 5:31 p.m., OCTAVIO
RODRIGO called ALFONSO RODRIGO on the telephone.   During the conversation,
ALFONSO RODRIGO and OCTAVIO RODRIGO agreed to pay "40" to an unknown individual

47

named Juan.   OCTAVIO RODRIGO stated, "No, the thing is that I was just talking to Juan,

right?   And, and I already told him and he said it's fine because if, if we could please come up

with 40, because he's having a hard time with those people.   He says that's why [Unintelligible]

problem."   ALFONSO RODRIGO stated, "What [Unintelligible] [stammers] what happened?"

OCTAVIO RODRIGO stated, "Juan. I was talking to him and he tells me that [pause] if, if we

could please make it to forty?"   ALFONSO RODRIGO stated, "Give it to them so that they

don't cry.   Give it to them."   OCTAVIO RODRIGO stated, "And that, well it's because he says

that he's having a hard time too because if it was up to him, then well," ALFONSO stated, "Give

it to them."   OCTAVIO RODRIGO stated, "[Unintelligible] problem either way." ALFONSO

RODRIGO stated, "Give it to them."   OCTAVIO RODRIGO stated, "Okay."   ALFONSO

RODRIGO stated, "Alright then."   OCTAVIO RODRIGO stated, "Alright then."

131.   On or about November 24, 2015, at approximately 11:59 a.m., ALFONSO

RODRIGO called MAURICE WALKER, aka CAL on the telephone.   During the conversation,

WALKER stated, "Them ni**as don't really like that one that, that one thang too much yo

(complaining about the quality of narcotics that ALFONSO RODRIGO had previously supplied

to him for redistribution).   Nope.   Motherf**ker was saying, that was the same as the other

one."   RODRIGO asked, "Of what other one?   The gray one?"   WALKER replied, "Yup."

132.   On or about November 24, 2015, at approximately 5:01 p.m., ALFONSO

RODRIGO called a person known by the Grand Jury but not indicted herein (hereinafter referred

to as A.W.), on the telephone.   During the conversation, the person asked, "Alright bro. What's

going on? Everything good?"   RODRIGO replied, "Uh, yeah just, I just talked to him (his

supplier) actually right now.   I got off the phone, they called me.   And uh.   Cause last time I

had, I had kind of yelled at them a little bit like man why the f**k you guys [short pause] tell me

48

this? And it's not what you told me. So, I didn't call them for like, I haven't, I haven't called them since Saturday. And then they called me right now talking about how they gave the order (for narcotics) when they said. It's just that it takes time for them to fill the order here I guess. So it could be while I'm gone. Even if it's while I'm gone, I gotta be, I gotta work so." Later in the call, RODRIGO stated, "I'm still not gonna open until I get back, 'cause I got. 'Cause there's nobody to verify everything, you know?"

133. On or about December 7, 2015, at approximately 6:57 p.m., MARIO AMADOR-RAMIREZ drove the gold Equinox to 18xxx Maple Heights Boulevard (residence of OCTAVIO RODRIGO) and backed into the driveway. AMADOR-RAMIREZ exited the driver's seat, removed several items from the rear of the Equinox, then walked behind the residence.

134. On or about December 7, 2015, at approximately 7:50 p.m., MANUEL MALDONADO arrived at 18xxx Maple Heights Boulevard and walked behind the residence carrying a large bag.

135. On or about December 7, 2015, at approximately 9:02 p.m., MARIO AMADOR-RAMIREZ, not carrying anything, entered the Chevrolet Equinox and departed the residence.

136. On or about December 7, 2015, at approximately 9:16 p.m., MANUEL MALDONADO, carrying a camouflage duffel bag, walked to and entered a taxi van that had arrived and stopped along the curb in front of 18xxx Maple Heights Boulevard and traveled to the Asian Plaza located at 2xxx Payne Avenue, Cleveland, Ohio. MANUEL MALDONADO exited the taxi van, and carried the same camouflage duffel bag into the Asian Plaza. At approximately 10:30 p.m., MALDONADO boarded a commercial bus destined for New York City with the camouflage duffel bag.

137.    On or about December 7, 2015, over the next approximate thirteen hours, MANUEL MALDONADO and ALFONSO RODRIGO sent text messages to each other regarding MALDONADO'S trip status.

138.    On or about December 8, 2015, at approximately, 10:30 a.m., ROLAND FRANCISCO RIVERA-ERAZO drove into the Yonkers Red Roof Inn parking lot where MANUEL MALDONADO was staying.

139.    On or about December 8, 2015, at approximately 11:30 a.m., MANUEL MALDONADO met with ROLAND FRANCISCO RIVERA-ERAZO, and gave him approximately $125,040 in United States currency from narcotic proceeds.

140.    On or about December 8, 2015, at approximately 11:34 a.m., MANUEL MALDONADO sent the following text message to ALFONSO RODRIGO, "K."   On or about December 8, 2015, at approximately 11:35 a.m., MANUEL MALDONADO sent the following text message to RODRIGO, "Kool."   On or about December 8, 2015, at approximately 11:40 a.m., MALDONADO sent the following text message to RODRIGO, "Done (indicating he had delivered the money)."

141.    On or about February 16, 2016, at approximately 12:55 p.m., VAN HERRON called ALFONSO RODRIGO on the telephone.   During the conversation, HERRON stated, "Aight, what's good? Um, [mumbles] where you gonna him (URRABAZO-MALDONADO, JR.) meet, meet, meet me at?"   ALFONSO RODRIGO stated, "I can have him (URRABAZO-MALDONADO, JR.) go wherever you want. It's that important."   HERRON stated, "Aight, um, say um, 185th.   That, um, What's right there?   That BP, I guess?   On 185th. (the BP gas station on East 185th Street in Cleveland, Ohio)."   RODRIGO stated, "185th, 185th, Okay, okay. How long?"   HERRON stated, "Do he, do he know how to get, get, um, there?"

50

RODRIGO stated, "Yeah, I'll, I'll tell him, though." HERRON stated, "Alright. [stammers] I'm." RODRIGO stated, "[unintelligible] That's easy." HERRON stated, "Huh?" RODRIGO stated, "It's easy." HERRON stated, "Alright. I'm right around here. How long you think it gonna' take him?" RODRIGO stated, "Uh, I'll call him right now. It'll take him like thirty minutes, 'cause, I know he at home." HERRON stated, "Aight, bet." RODRIGO stated, "Aight. Uh, hey, it's everything, it's everything (all of the owed money)?" HERRON stated, "Um, I have a nice piece (portion of the owed money) for you." RODRIGO stated, "Okay." HERRON stated, "Aight."

142.    On or about February 16, 2016, at approximately 1:33 p.m., VAN HERRON called ALFONSO RODRIGO on the telephone.   During the conversation, RODRIGO stated, "Hey, he says he's about five minutes away."

143.    On or about February 16, 2016, at approximately 1:44 p.m., VAN HERRON drove a black Range Rover to the BP gas station located at 1xxx E. 185th Street, Cleveland, Ohio.   HERRON exited the black Range Rover and entered the BP store.   At approximately 1:46 p.m., HERRON exited the BP store while talking on a cellular telephone and holding another cellular telephone in his hand. HERRON then re-entered the black Range Rover.

144.    On or about February 16, 2016, at approximately 1:46 p.m., VAN HERRON called ALFONSO RODRIGO on the telephone.   During the conversation, HERRON asked, "What up? Where he at?"   RODRIGO responded, "F**k. Um, let me call him [unintelligible]. Hold on, don't hang up. He told me he was like five minutes away, man."   Shortly thereafter, RODRIGO was heard having another conversation in which he asked, "How much longer?" RODRIGO then said to HERRON, "He's getting off the exit right now."

51

145.    On or about February 16, 2016, at approximately 1:48 p.m., DAVID URRABAZO-MALDONADO, JR., drove a black Ford Expedition to the same BP gas station, and parked to the left of the black Range Rover occupied by VAN HERRON.   Shortly thereafter, HERRON exited the Range Rover and approached the black Ford Expedition on the passenger side.   HERRON passed a brown paper bag through the window of the Ford Expedition.   HERRON then turned around shortly after passing the bag and entered the Range Rover.   At approximately 1:50 p.m., URRABAZO-MALDONADO, JR., and HERRON departed in their respective vehicles.

146.    On or about February 17, 2016, at approximately 1:39 p.m., ALFONSO RODRIGO called VAN HERRON on the telephone. During the conversation, HERRON stated, "I got a couple more dollars (further payment for previously fronted narcotics) for you, too." ALFONSO RODRIGO stated, "Hey, what'd you said?"   HERRON stated, "I said, I got a couple more dollars for you, too." ALFONSO RODRIGO stated, "Uh-huh. Oh, you know why I'm calling?"   HERRON stated, "Yeah, I already know why you're calling."   HERRON stated, "[laughs]. That's, that's [stammers] the only time you call me, dang."

147.    On or about February 18, 2016, at approximately 5:34 p.m., ALFONSO RODRIGO called OCTAVIO RODRIGO, who passed the phone to DAVID URRABAZO-MALDONADO, JR.   ALFONSO RODRIGO and URRABAZO-MALDONADO, JR. then exchanged the following dialogue:

RODRIGO:   Hey, I'll pick you up in thirty minutes so you can get out.
URRABAZO-MALDONADO, JR.:   What happened?
RODRIGO:   Huh? I said, I gotta pick you up in thirty minutes so you could fly out.
URRABAZO-MALDONADO, JR.:   Right now?
RODRIGO:   Yeah.
URRABAZO-MALDONADO, JR.:   I'm flying out in thirty minutes, right now?
RODRIGO:   No, No. Your flight is at eight o'clock out of Akron, but we gotta, you

52

gotta be there at seven, I'm just gonna leave here at six.

URRABAZO-MALDONADO, JR.:  F**k, [Unintelligible].

RODRIGO:  And them, uh [sniffs]... Uh...last name U r r a b a z o, correct?

148.    On or about February 20, 2016, at approximately 2:20 a.m., DAVID

URRABAZO-MALDONADO, JR., while at the Greyhound bus stop in Pittsburgh,

Pennsylvania, possessed $40,000 of United States currency in three tightly wrapped stacks in a

heat sealed vacuum sealed bag.

149.    On or about February 20, 2016, at approximately 10:46 a.m., a person known to

the Grand Jury but not indicted herein (hereinafter referred to as T.R.), called ALFONSO

RODRIGO on the telephone.   During the conversation, RODRIGO told this person, "Yesterday

was, all bad (the $40,000 money seizure in Pittsburgh).   By far the worst day of the year."

150.    On or about February 22, 2016, at approximately 9:10 p.m., ALFONSO

RODRIGO placed an unanswered phone call to VAN HERRON.   During this attempted call,

ALFONSO RODRIGO was heard saying aside, "Lost the money.   Lost that 40 g's.   It was in

the (unintelligible)."

151.    On or about February 25, 2016, at approximately 10:11 a.m., DAVID

URRABAZO-MALDONADO, JR., called ALFONSO RODRIGO on the telephone.   During the

call, URRABAZO-MALDONADO, JR., stated he had good news and needed to get a phone

card (a new phone).

152.    On or about February 29, 2016, at approximately 9:44 p.m., ALFONSO

RODRIGO called ISMAEL JACINTO ACOSTA on the telephone.   During the conversation,

ACOSTA stated, "So, can we go tomorrow?"   ALFONSO stated, "I don't know.   I have a shit

load of things to do.   I'm not, I'm not going to be free until like in the evening."   ACOSTA

stated, "It's just to, to see if you are going to help me out (payment for previously supplied

narcotics)?"  ALFONSO stated, "No well, they already came and they didn't, didn't attend to me. [pause].  Right now, but maybe.  I don't know, I'm waiting for them (his suppliers)."  ACOSTA stated, "that's fine."

153.  On or about March 1, 2016, at approximately 10:30 p.m., DAVID URRABAZO-MALDONADO, JR., called ALFONSO RODRIGO on the telephone.  During the conversation, RODRIGO told URRABAZO-MALDONADO, JR. to give "Two stacks ($2,000)" to IZZY (ISMAEL JACINTO ACOSTA).

154.  On or about March 16, 2016, at approximately 11:45 a.m., ALFONSO RODRIGO called OCTAVIO RODRIGO on the telephone.  During the conversation, OCTAVIO RODRIGO stated, "I've been calling the towers (New York).  Be ready with the little peanut (different phone), I'm going to call you soon."

155.  On or about March 16, 2016, at approximately 8:45 p.m., ALFONSO RODRIGO received a call from OCTAVIO RODRIGO.  During this call, OCTAVIO RODRIGO told ALFONSO RODRIGO, "Hey son, they are calling and calling you to the other one."  ALFONSO RODRIGO replied, "I have it here in my hand. . ."  Later in the conversation, ALFONSO RODRIGO stated, "Maybe Martin gave it wrong."  Shortly thereafter, ALFONSO RODRIGO said "440 903 8168" as OCTAVIO RODRIGO repeated it aloud.  ALFONSO RODRIGO then said, "I have it on my hand and it hasn't rang.  And I told Martin [unintelligible] that he had to leave his, because I had some stuff to do.  That's why I left his, but the one from here I have it with me."

156.  On or about March 16, 2016, at approximately 9:02 p.m., ALFONSO RODRIGO received a text message from an unknown individual using a Mexican telephone number.  This text message stated, in Spanish, "2038326757 ask for Trejo on behalf of the relative call them

now so that he/she/it will be ready."   Four minutes later, at approximately 9:06 p.m.,

RODRIGO called (203) 832-6757 with a duration of approximately 3 minutes and 19 seconds.

157.   On or about March 16, 2016, at approximately 9:22 p.m., ALFONSO RODRIGO

received an incoming call from OCTAVIO RODRIGO in Spanish.   OCTAVIO RODRIGO told

ALFONSO RODRIGO, "Hey, gorilla says to talk to them [unintelligible section], because they

also need to come back."   ALFONSO RODRIGO replied, "I already did." Later in the call,

ALFONSO RODRIGO stated, "Yes, they already know that I'm leaving. In two hours I'm

leaving here and I'm meeting them tomorrow early."

158.   On or about March 17, 2016, ALFONSO RODRIGO and DAVID URRABAZO-

MALDONADO, JR., driving in a Ford Expedition known to be used by RODRIGO, drove from

Warrensville Heights, Ohio, to 6x Woodycrest Avenue, Yonkers, New York.   At approximately

8:30 p.m., URRABAZO-MALDONADO JR., traveled to a McDonald's restaurant in the Bronx

and met with unknown individuals.   URRABAZO-MALDONADO, JR. exited the restaurant

with a backpack that he had not carried into the restaurant.   URRABAZO-MALDONADO, JR.

then traveled back to Maple Heights, Ohio, in RODRIGO's Ford Expedition.

159.   On or about March 18, 2016, at approximately 12:44 p.m., ALFONSO

RODRIGO called OCTAVIO RODRIGO.   During part of the conversation, OCTAVIO

RODRIGO and ALFONSO RODRIGO exchanged the following dialogue:

ALFONSO RODRIGO:   Oh, oh, yes, yes, yes. Everything is fine. The [unintelligible]
are for him.
OCTAVIO RODRIGO:   Okay, okay. Yes, but in case they ask us anything, so we know
what to say to, to...[unintelligible] York. [voices overlap]
ALFONSO RODRIGO:   No, he knows. [dial tone] He already knows that Piro is not
coming until... I told them that until Monday, but he might come in tomorrow.
OCTAVIO RODRIGO:   Oh, okay.
ALFONSO RODRIGO:   I just told them that Monday to make sure.

160.    On or about March 18, 2016, at approximately 5:36 p.m., ALFONSO RODRIGO

called OCTAVIO RODRIGO and spoke in Spanish, exchanging the following dialogue:

OCTAVIO RODRIGO:   It was already told when it would have the. . .
ALFONSO RODRIGO:   Yes, but [stammers] but Grande (big), didn't get it and he was
going to loan it to me.
OCTAVIO RODRIGO:   Oh, will have to wait, hopefully a little, because as soon as you
deliver, they are going to serve us.
ALFONSO RODRIGO:   Huh?
OCTAVIO RODRIGO:   As soon as that gets fixed, how can I say it?
ALFONSO RODRIGO:   Well, yes. I already know.

161.    On or about March 20, 2016, at approximately 2:53 p.m., JAMES CARVER

called ALFONSO RODRIGO on the telephone. During part of this call, CARVER stated, "Yea

I'm, I'm getting ready right now to head out.   Be ready, see you soon."

162.    On or about March 20, 2016, at approximately 4:53 p.m., JAMES CARVER sent

TENNILLE BRYANT a text message stating, "2999 payne ave cleveland where u get off at."

163.    On or about March 20, 2016, at approximately 5:03 p.m., JAMES CARVER sent

TENNILLE BRYANT a text message stating "It work."   BRYANT replied "Yup."

164.    On or about March 20, 2016, at approximately 5:35 p.m., JAMES CARVER

called ALFONSO RODRIGO on the telephone.   During the conversation, CARVER stated,

"I'm on the road, all around. See you soon."

165.    On or about March 20, 2016, at approximately 5:38 p.m., TENNILLE BRYANT

sent JAMES CARVER a text message stating, "You always got me out in snow storms lol."

166.    On or about March 20, 2016, at approximately 7:04 p.m., ALFONSO RODRIGO

called DAVID URRABAZO-MALDONADO, JR., exchanging the following dialogue:

RODRIGO:   Hey, did you ever get Jimmy (JAMES CARVER) the number to the taxi?
URRABAZO-MALDONADO, JR.:   No, I didn't. I don't have his number.
RODRIGO:   Aight. Damn, he's on his way. Um, I don't even know if he has cash, dude. Can
you be down there? At that time?

56

URRABAZO-MALDONADO, JR.:   At what time?

RODRIGO:   Um. What time, what time does the plane usually arrives? Three?

URRABAZO-MALDONADO, JR.:   Yeah. He don't, he don't have my number?

RODRIGO:   Yeah, but it's like, you know what I mean? It's a good call. [pause]. I mean I can, I can tell him whatever. You know what? I shoot, I shoot 'em your number. I'll call 'em.

URRABAZO-MALDONADO, JR.:   I'm a just a [unintelligible] right now, so I can be down there.

RODRIGO:   [unintelligible] Gotta be just f**kin' comin' on a taxi, no?

URRABAZO-MALDONADO, JR.:   Yeah, cause it's kinda dangerous. [voices overlap]

RODRIGO:   Yeah, yeah. It's a f**ked up time. Aight, let me figure. Let me. How, I don't wanna call him 'til later, you know what I mean? Do me a favor [unintelligible].

URRABAZO-MALDONADO, JR.:   If I have to be down there to, to give him some money, I'll give him some money and I just come back by myself.

RODRIGO:   Oh, you can pay for it, you can pay for taxi when it get there.

URRABAZO-MALDONADO, JR.:   Okay, yeah. I can do that too.   Yeah.

167.     On or about March 21, 2016, at approximately 12:28 a.m., JAMES CARVER sent

TENNILLE BRYANT a text message stating, "2166948808 cab number when u get there."

168.     On or about March 21, 2016, at approximately 1:56 a.m., TENNILLE BRYANT

sent JAMES CARVER a text message stating, "Whats the adress cuz the address you text me is

where i got off the bus."   CARVER responded one minute later stating, "On the paper."

169.     On or about March 21, 2016, at approximately 2:18 a.m., a dark-colored sedan

arrived and stopped at the curb in front of 18xxx Maple Heights Boulevard, Maple Heights, Ohio

(OCTAVIO RODRIGO's residence).   TENNILLE BRYANT, wearing a long black coat, exited

the passenger side of the vehicle and carried and delivered a dark colored bag containing

approximately one kilogram of fentanyl to DAVID URRABAZO-MALDONADO, JR., who was

at RODRIGO's home.

170.     On or about March 21, 2016, at approximately 2:20 a.m., DAVID URRABAZO-

MALDONADO, JR., called ALFONSO RODRIGO on the telephone.   RODRIGO answered

the telephone and URRABAZO-MALDONADO, JR., stated, "Yo, we're good (the fentanyl had

arrived)."   RODRIGO responded with a celebratory, "Wooo!"   Shortly thereafter, RODRIGO

stated, "You don't know how bad I needed it." Later, URRABAZO-MALDONADO, JR.,

stated, "It's the sister (JAMES CARVER's sister, TENNILLE BRYANT had come instead of

CARVER)." RODRIGO replied, "Oh shit, f**k yeah, tell her I love her." RODRIGO then

told URRABAZO-MALDONADO, JR., "First thing in the morning, I need you to text Fat Boy,

be like 'Yo Yo,' and as soon as he answers that 'yo yo,' come to Dad's (OCTAVIO's house),

come to Pop's please ASAP." At the end of the call, RODRIGO told URRABAZO-

MALDONADO, JR., "She can be on her way however she wants, either plane, bus, however she

wants, okay (they will provide transportation for TENNILLE BYRANT back to Yonkers)?"

171. On or about March 21, 2016, at approximately 9:43 a.m., ALFONSO RODRIGO,

OCTAVIO RODRIGO, DAVID URRABAZO-MALDONADO, JR., JAMES CARVER, and

TENNILLE BRYANT controlled and possessed the following items inside 18xxx Maple Heights

Boulevard, Maple Heights, Ohio (OCTAVIO RODRIGO's residence): approximately one

kilogram of fentanyl, a money counter machine, suspected drug ledgers, a food sealer machine, a

roll of plastic wrap, and thirteen cellular telephones, all of which were seized pursuant to a

federal search warrant.

172. On or about March 21, 2016, at approximately 12:22 p.m., ALFONSO

RODRIGO called JAMES CARVER, and engaged in the following conversation:

RODRIGO:  They're there, they're (law enforcement) gonna come in, dude. Tell her just open it
and flush it (the fentanyl).
CARVER:  Who's coming in?
RODRIGO:  They're, They're gonna come in, dog. I know they are. . .
CARVER:  Alright. I'm gonna, I'm gonna talk right. . . Let me call now. . .
RODRIGO:  I'm waiting for a call back, but however, just have it opened, and ready. If
she hears that door, flush (flush the fentanyl down the toilet).

173. On or about March 21, 2016, at approximately 12:23 p.m., JAMES CARVER

called ALFONSO RODRIGO on the telephone. CARVER told RODRIGO, "Her phone is off."

174.    On or about March 21, 2016, at approximately 12:37 p.m., a person unknown to Grand Jury called ALFONSO RODRIGO on the telephone.   During this call, the unknown person and RODRIGO discussed the search warrant at 18xxx Maple Heights Boulevard that had occurred earlier in the morning.   The unknown person asked, "Was it the strong one?   The one that was there or just any shit of the other one?"   RODRIGO replied, "No, it was the strong one (fentanyl)."   Later during the same phone call, RODRIGO said that the taxi left and 3 or 4 hours later, the "tragedy" came.   The unknown person replied, "F**k, it had a tail?"   Later during the same intercepted phone call, the unknown person told RODRIGO, "Now change your device (switch your phone)."

175.    On or about March 21, 2016, at approximately 1:47 p.m., ALFONSO RODRIGO called VAN HERRON on the telephone.   RODRIGO asked HERRON, "Ain't nothin' at Ashley's, right?"   HERRON replied, "No why what happen."   RODRIGO explained that "They (law enforcement) went to my dad's house."   During the conversation, HERRON asked "I mean, it was clean, right (OCTAVIO RODRIGO's house was drug-free)?"   RODRIGO responded, "Nope."

176.    On or about March 24, 2016, at approximately 6:36 p.m., VAN HERRON called ALFONSO RODRIGO on the telephone.   During the conversation, HERRON stated he was with another male during this call, and passed the telephone to this unknown male for part of the call.   During portions of this call, the three parties engaged in the following conversation: the unknown male stated, "Yes. And [stammers] is he (HERRON) going to give me money?"   ALFONSO RODRIGO then instructed the unknown male to pass the phone to HERRON.   RODRIGO then asked HERRON, "Hey, you took that for him?"   HERRON replied, "I could only give, um, two."   RODRIGO then asked to speak with the other male.   RODRIGO told the

male, "Yes, he says that he could only, he could only get that really quickly." RODRIGO

explained that he was away and stated, "They called me last minute that you were there already."

The unknown male asked, "How much is he going to give me?" RODRIGO replied, "It's only

two, sir." RODRIGO later explained that no one was around and they only told him "attend to

these people." Later in the conversation, the unknown male stated, "No well, that you were

going to give me [mumbles] um, 28." RODRIGO stated, "They told you twenty-eight?" The

unknown male stated, "Yes, for what was pending for the other thing." RODRIGO stated,

"Yeah, [stammers] no one is around. Um, let me call my dad (OCTAVIO RODRIGO) because

he's the one that, he's the one that, he's the one that, well I didn't know. He did everything. He

arranged the whole thing."

    177. On or about April 7, 2016, at approximately 11:35 a.m., OCTAVIO RODRIGO

called ALFONSO RODRIGO. During part of this call, the RODRIGOs exchanged the following

dialogue in Spanish:

```
OCTAVIO RODRIGO:   Okay, uh, Don Alejandro keeps calling me over and over.
ALFONSO RODRIGO:   Well, answer him.
OCTAVIO RODRIGO:   Yeah? What should I tell him? [Unintelligible] Huh?
ALFONSO RODRIGO:   Huh? Um, let me call him. Let me call him.
OCTAVIO RODRIGO:   Oh, okay. Yes, either way, either way I'll answer him later on.
ALFONSO RODRIGO:   Okay, then. Bye
```

    178. On or about April 7, 2016, at approximately 11:38 a.m., ALFONSO RODRIGO

called OCTAVIO RODRIGO. During part of the call, the RODRIGOs exchanged the following

dialogue in Spanish:

```
OCTAVIO RODRIGO:   Hello?
ALFONSO RODRIGO:   I think he's calling from his office number because I only have
the restaurant's number. But the office's number. . . [voices overlap]
OCTAVIO RODRIGO:   Well, I'm going to answer him right now. If he asks me something,
what should I tell him?
```

ALFONSO RODRIGO:   No, well, no. You know best. You need to have there. . . No, just. Tell him. Just ask him what time you can call him at the restaurant.
OCTAVIO RODRIGO:   Okay.
ALFONSO RODRIGO:   Just ask him what time.

179.   On or about April 12, 2016, at approximately 11:45 a.m., MARIO AMADOR-RAMIREZ called ISMAEL JACINTO ACOSTA on the telephone.   AMADOR-RAMIREZ told ACOSTA that something "Bad had happened" and the "little house" was "turned upside down."

180.   On or about April 12, 2016, at approximately 12:07 p.m., MARIO AMADOR-RAMIREZ called ISMAEL JACINTO ACOSTA on the telephone.   During the call, AMADOR-RAMIREZ again talked about the house and stated it was "searched, it was searched because they didn't take anything.   The hammers were still there, the television, the VCR.   It was searched, they left it upside down."   ACOSTA asked, "Did they leave a piece of paper (warrant or inventory form) there?"   AMADOR-RAMIREZ said they didn't leave anything. AMADOR-RAMIREZ stated multiple times that either the old man went crazy or was not being honest with ACOSTA.   ACOSTA stated he was talking with the old man and had mentioned that "the police would have taken down the door in order to get inside."   ACOSTA asked AMADOR-RAMIREZ if he saw anything weird when he left, which AMADOR-RAMIREZ negated.   ACOSTA stated, "You should go look to see if they left a piece of paper somewhere there, dude.   Around there to see if they left a paper, because those guys leave a paper sometimes."   ACOSTA asked if they didn't take anything.   AMADOR-RAMIREZ stated, "Nothing, dude, nothing. Because the main thing, (firearm) is still there. Logically that would've been gone." ACOSTA then asked, "The helmet (firearm) is still there, you said?"   AMADOR-RAMIREZ affirmed and stated he got up and "stepped on it" but didn't "open it" to "check it right."   AMADOR-RAMIREZ further stated, "They didn't, didn't open it up."   AMADOR-

RAMIREZ asked ACOSTA what they should do and asked if they should stop everything or what. ACOSTA responded that there was nothing to do. Later during the call, ACOSTA asked AMADOR-RAMIREZ if he would go and clean it up. AMADOR-RAMIREZ stated he would give it a few days and go another day to clean it up. ACOSTA stated, "Well it's the same thing, dude. If they (police) were going to get you, they would've gotten you there right now."

181.    On or about April 14, 2016, MARIO AMADOR-RAMIREZ traveled to 2xxx North Green Road, Cleveland, Ohio, as instructed by ISMAEL JACINTO ACOSTA.

182.    On or about April 15, 2016, MARIO AMADOR-RAMIREZ and ISMAEL JACINTO ACOSTA controlled and possessed the following items, seen by law enforcement pursuant to federal search warrant inside the residence located at 2xxx North Green Road, Cleveland, Ohio: multiple rolls of green cellophane wrap, boxes of dryer sheets (with no washing machine or dryer in the house), a pack of razor blades, numerous loose rubber bands, a food sealer machine, bars of soap, an electronic scale, various travel bags, and two cellular telephones inside a pack of paper towels.

183.    On or about April 15, 2016, MARIO AMADOR-RAMIREZ and ISMAEL JACINTO ACOSTA controlled and possessed the following items, seized by law enforcement pursuant to federal search warrant inside the residence located at 2xxx North Green Road, Cleveland, Ohio: a Glock 23 handgun, and approximately one half ounce of cocaine wrapped with green cellophane.

184.    On or about April 20, 2016, at approximately 1:04 p.m., MARIO AMADOR-RAMIREZ called ISMAEL JACINTO ACOSTA on the telephone. During this conversation, ACOSTA stated, "Yes, dude. They already finish. They didn't find the helmet (individuals

went to 2xxx North Green Road, Cleveland, Ohio, after the execution of the search warrant and these individuals could not find the gun seized by law enforcement)." AMADOR-RAMIREZ stated, "Nah! What the f**k!" ACOSTA stated, "Mm-Hum." AMADOR-RAMIREZ stated, "Oh my dear God."

185. On or about April 20, 2016, at approximately 6:36 p.m., VAN HERRON called ALFONSO RODRIGO on the telephone. During the call, HERRON notified RODRIGO that he had recently received narcotics proceeds to pay to RODRIGO, and HERRON was discussing where to meet RODRIGO to deliver the money.

186. On or about April 21, 2016, at approximately 12:02 p.m., OCTAVIO RODRIGO called ALFONSO RODRIGO on the telephone. During the conversation, OCTAVIO told ALFONSO that some people had followed him to the bank. OCTAVIO stated the people following him didn't seem like police because they looked too fake or ghetto, but ALFONSO argued that the police who followed DAVID URRABAZO-MALDONADO, JR., also looked fake or ghetto.

All in violation of Title 21, United States Code, Section 846.

COUNT 2

The Grand Jury further charges:

On or about December 13, 2014, in the Northern District of Ohio, Eastern Division, the defendants ISMAEL JACINTO ACOSTA, aka IZZY, JOSE HERNANDEZ, and JUAN CARLOS SOLIS, did knowingly and intentionally possess with the intent to distribute approximately two kilograms of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and Title 18, United States Code, Section 2.

63

COUNT 3

The Grand Jury further charges:

On or about December 13, 2014, in the Northern District of Ohio, Eastern Division, the defendants JOSE HERNANDEZ and JUAN CARLOS SOLIS, did travel in interstate commerce between the state of Illinois, and the state of Ohio, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: a business enterprise involving the distribution of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and the said HERNANDEZ and SOLIS thereafter, did perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 2 and 1952(a)(3).

COUNT 4

The Grand Jury further charges:

On or about November 18, 2014, in the Northern District of Ohio, Eastern Division, the defendant RYAN MILLER, did knowingly and intentionally distribute approximately 28 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

COUNT 5

The Grand Jury further charges:

On or about December 5, 2014, in the Northern District of Ohio, Eastern Division, the defendant RYAN MILLER, did knowingly and intentionally distribute approximately 24.8 grams of a mixture or substance containing a detectable amount of cocaine, a Schedule II

controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## COUNT 6

The Grand Jury further charges:

On or about January 30, 2015, in the Northern District of Ohio, Eastern Division, the defendant JONATHAN STEPP, did knowingly and intentionally distribute approximately 7.9 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## COUNT 7

The Grand Jury further charges:

On or about March 19, 2015, in the Northern District of Ohio, Eastern Division, the defendant JONATHAN STEPP, did knowingly and intentionally distribute approximately 10 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

## COUNT 8

The Grand Jury further charges:

On or about August 27, 2015, in the Northern District of Ohio, Eastern Division, the defendants ALFONSO RODRIGO and MAURICE WALKER, aka CAL, did knowingly and intentionally distribute approximately 3.5 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNT 9

The Grand Jury further charges:

On or about September 23, 2015, in the Northern District of Ohio, Eastern Division, the defendants ALFONSO RODRIGO and DAVID URRABAZO-MALDONADO, JR., did knowingly and intentionally distribute approximately 112 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

## COUNT 10

The Grand Jury further charges:

On or about March 17, 2016, through March 21, 2016, in the Northern District of Ohio, Eastern Division, the defendants ALFONSO RODRIGO, JAMES CARVER, TENNILLE BRYANT and DAVID URRABAZO-MALDONADO, JR., did knowingly and intentionally possess with the intent to distribute approximately 1 kilogram of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A), and Title 18, United States Code, Section 2.

## COUNT 11

The Grand Jury further charges:

On or about March 17, 2015, in the Northern District of Ohio, Eastern Division, the defendants DAVID URRABAZO-MALDONADO, JR. and TENNILLE BRYANT, did travel in interstate commerce between the state of New York, and the state of Ohio, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment,

and carrying on of an unlawful activity, to wit: a business enterprise involving the distribution of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and then said TENNILLE BRYANT and DAVID URRABAZO-MALDONADO, JR., thereafter, did perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 2 and 1952(a)(3).

<u>COUNTS 12-40</u>

The Grand Jury further charges:

On or about the dates and approximate times listed below, in the Northern District of Ohio, and elsewhere, the defendants listed below did knowingly and intentionally use a communication facility, to wit: a telephone, to facilitate acts constituting a felony under Title 21, United States Code, Section 846:

| Count | Defendants | Date | Time |
|-------|-----------|------|------|
| 12 | ISMAEL JACINTO ACOSTA, aka IZZY JOSE HERNANDEZ | December 9, 2014 | 10:02 a.m. |
| 13 | ISMAEL JACINTO ACOSTA, aka IZZY JOSE HERNANDEZ | December 11, 2014 | 5:35 p.m. |
| 14 | ISMAEL JACINTO ACOSTA, aka IZZY JOSE HERNANDEZ | December 13, 2014 | 7:15 a.m. |
| 15 | ISMAEL JACINTO ACOSTA, aka IZZY CESAR ZAMBRANO-ESPINAL | January 15, 2015 | 5:23 p.m. |
| 16 | ISMAEL JACINTO ACOSTA, aka IZZY CESAR ZAMBRANO-ESPINAL | January 15, 2015 | 6:56 p.m. |
| 17 | ISMAEL JACINTO ACOSTA aka IZZY MARIO AMADOR-RAMIREZ | January 23, 2015 | 9:55 a.m. |
| 18 | JONATHAN STEPP | January 30, 2015 | 2:17 p.m. |
| 19 | ISMAEL JACINTO ACOSTA aka IZZY CESAR ZAMBRANO-ESPINAL | January 30, 2015 | 4:00 p.m. |
| 20 | JONATHAN STEPP | March 6, 2015 | 2:42 p.m. |
| 21 | JONATHAN STEPP | March 19, 2015 | 11:42 a.m. |

| 22 | CESAR ZAMBRANO-ESPINAL<br>JONATHAN STEPP | March 19, 2015 | 12:59 p.m. |
| 23 | REINALDO HERNANDEZ<br>CESAR ZAMBRANO-ESPINAL | April 4, 2015 | 8:12 p.m. |
| 24 | REINALDO HERNANDEZ<br>CESAR ZAMBRANO-ESPINAL | April 9, 2015 | 12:30 p.m. |
| 25 | MARIO AMADOR-RAMIREZ<br>CESAR ZAMBRANO-ESPINAL | Aril 9, 2015 | 12:44 p.m. |
| 26 | ALFONSO RODRIGO | August 27, 2015 | 8:10 p.m. |
| 27 | ALFONSO RODRIGO<br>MAURICE WALKER, aka CAL | August 28, 2015 | 12:25 a.m. |
| 28 | ALFONSO RODRIGO | September 23, 2015 | 7:00 p.m. |
| 29 | ALFONSO RODRIGO<br>DAVID URRABAZO-MALDONADO, JR. | November 23, 2015 | 1:45 p.m. |
| 30 | OCTAVIO RODRIGO<br>ALFONSO RODRIGO | November 23, 2015 | 5:31 p.m. |
| 31 | ALFONSO RODRIGO<br>MAURICE WALKER, aka CAL | November 24, 2015 | 11:59 a.m. |
| 32 | ALFONSO RODRIGO<br>MANUEL MALDONADO | December 8, 2015 | 11:35 a.m. |
| 33 | VAN HERRON<br>ALFONSO RODRIGO | February 16, 2016 | 12:55 p.m. |
| 34 | VAN HERRON<br>ALFONSO RODRIGO | February 16, 2016 | 1:46 p.m. |
| 35 | VAN HERRON<br>ALFONSO RODRIGO | February 17, 2016 | 1:39 p.m. |
| 36 | DAVID URRABAZO-MALDONADO, JR.<br>ALFONSO RODRIGO | February 25, 2016 | 10:11 a.m. |
| 37 | ALFONSO RODRIGO<br>ISMAEL JACINTO ACOSTA | February 29, 2016 | 9:44 p.m. |
| 38 | ALFONSO RODRIGO<br>OCTAVIO RODRIGO | March 16, 2016 | 11:45 a.m. |
| 39 | JAMES CARVER<br>ALFONSO RODRIGO | March 20, 2016 | 5:35 p.m. |
| 40 | VAN HERRON<br>ALFONSO RODRIGO | March 24, 2016 | 6:36 p.m. |

All in violation of Title 21, United States Code, Section 843(b).

<u>COUNT 41</u>

The Grand Jury further charges:

On or about January 25, 2013, in the Northern District of Ohio, Eastern Division, the defendant ISMAEL JACINTO ACOSTA, aka IZZY, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by depositing $5,000 into Key Bank account number 350xxxxxxxxx, an account associated with ACOSTA, that the financial transaction was designed in whole or in part to conceal the true ownership of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>COUNT 42</u>

The Grand Jury further charges:

On or about June 10, 2013, in the Northern District of Ohio, Eastern Division, the defendant ISMAEL JACINTO ACOSTA, aka IZZY, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by depositing $2,000 into Key Bank account number 350xxxxxxxx, an account associated with ACOSTA, and knowing that the financial transaction was designed in whole or in part to conceal the true ownership of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 43

The Grand Jury further charges:

On or about October 24, 2014, in the Northern District of Ohio, Eastern Division, the defendant ISMAEL JACINTO ACOSTA, aka IZZY, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by depositing $500 into PNC Bank account number 410xxxxxxx, an account associated with ACOSTA, and $1,000 into PNC Bank account number 427xxxxxxx, an account associated with ACOSTA, and knowing that the financial transaction was designed in whole or in part to conceal the true ownership of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 44

The Grand Jury further charges:

On or about December 22, 2014, in the Northern District of Ohio, Eastern Division, the defendant ISMAEL JACINTO ACOSTA, aka IZZY, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by depositing $2,000 into PNC Bank account number (410xxxxxxx), an account associated with ACOSTA, and $1,960 into PNC Bank account number (427xxxxxxx), an account associated with ACOSTA, and knowing

that the financial transaction was designed in whole or in part to conceal the true ownership of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 45

The Grand Jury further charges:

On or about November 17, 2015, in the Northern District of Ohio, Eastern Division, the defendant ISMAEL JACINTO ACOSTA, aka IZZY, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial transaction affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by depositing $2,000 into PNC Bank account number (410xxxxxxx), an account associated with ACOSTA, and knowing that the financial transaction was designed in whole or in part to conceal the true ownership of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 46

The Grand Jury further charges:

Beginning on or before September 15, 2014, and continuing through September 28, 2016, in the Northern District of Ohio and elsewhere, the defendants ISMAEL JACINTO ACOSTA, aka IZZY, MARIO AMADOR-RAMIREZ, and NANCY VARGAS, did knowingly and intentionally combine, conspire, confederate and agree together and with each other and with other persons to commit violations of Title 18, United States Code Section 1956(a)(1)(B)(i), specifically, knowing that the property involved in the financial transaction represented the

71

proceeds of some form of unlawful activity, did conduct or attempt to conduct a financial

transaction affecting interstate and foreign commerce which in fact involved the proceeds of

specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21,

United States Code Section 841(a)(1), by depositing a total of $123,279.99 in cash and money

orders into J.P. Morgan Chase Bank, a financial institution as defined by Title 31, United States

Code Section 5312(a)(2)(A), account number (636xxxxxx), in the name of XYZ Home

Investments, in violation of Title 18, United States Code, Section 1956(h).

COUNT 47

The Grand Jury further charges:

Beginning on or before August 1, 2013, and continuing through September 28, 2016, in

the Northern District of Ohio, and elsewhere, the defendants ISMAEL JACINTO ACOSTA, aka

IZZY and MARIO AMADOR-RAMIREZ, did knowingly and intentionally combine, conspire,

confederate and agree together and with each other and with other persons, to commit violations

of Title 18, United States Code Section 1956(a)(1)(B)(i), specifically, knowing that the property

involved in the financial transaction represented the proceeds of some form of unlawful activity,

did conduct or attempt to conduct a financial transaction affecting interstate and foreign

commerce which in fact involved the proceeds of specified unlawful activity, to wit: distribution

of controlled substances in violation of Title 21, United States Code Section 841(a)(1), by

depositing a total of $110,545 in cash and money orders into PNC Bank, a financial institution as

defined by Title 31, United States Code, Section 5312(a)(2)(A), account numbers (427xxxxxxx)

and (410xxxxxxx), both accounts associated with ACOSTA, in violation of Title 18, United

States Code, Section 1956(h).

## COUNT 48

The Grand Jury further charges:

Between on or about September 5, 2013, and September 28, 2016, in the Northern District of Ohio, and elsewhere, the defendants ALFONSO RODRIGO and MARGARET FERNANDEZ, did knowingly and intentionally combine, conspire, confederate and agree together and with each other and with other persons, to knowingly engage in a monetary transaction, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 derived from a specified unlawful activity, to wit: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1), by using drug trafficking proceeds to purchase six houses via Cuyahoga County forfeited land sale auctions for a total of $41,573.50 in cash and money orders, in violation of Title 18, United States Code, Sections 1956(h) and 1957.

## COUNT 49

The Grand Jury further charges:

On or about September 5, 2013, in the Northern District of Ohio, the defendant MARGARET FERNANDEZ, did knowingly engage in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, by purchasing a home through the Cuyahoga County forfeited land sale using money orders totaling $10,773.50, in violation of Title 18, United States Code, Section 1957.

## COUNT 50

The Grand Jury further charges:

On or about April 16, 2014, in the Northern District of Ohio, the defendant MARGARET FERNANDEZ, did knowingly engage in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, by purchasing a home through the Cuyahoga County forfeited land sale using money orders totaling $11,000, in violation of Title 18, United States Code, Section 1957.

## COUNT 51

The Grand Jury further charges:

On or about September 22, 2015, in the Northern District of Ohio, the defendant MARGARET FERNANDEZ, did knowingly engage in a monetary transaction through a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, by purchasing a home through the Cuyahoga County forfeited land sale using money orders totaling $19,800, in violation of Title 18, United States Code, Section 1957.

## FORFEITURE

The Grand Jury further charges:

The allegations of Counts 1 through 51, inclusive are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 21 U.S.C. § 853 and 18 U.S.C. § 982.   As a result of the foregoing offenses, ISMAEL JACINTO ACOSTA, aka IZZY, ALFONSO RODRIGO, DAVID URRABAZO-MALDONADO, JR., TENNILLE BRYANT, JAMES CARVER, VAN HERRON, JOSE HERNANDEZ, OCTAVIO RODRIGO, JUAN CARLOS SOLIS, MARIO AMADOR-RAMIREZ, ROLAND FRANCISCO RIVERA-

ERAZO, MAURICE WALKER, aka CAL, MANUEL MALDONADO, REINALDO HERNANDEZ, CESAR ZAMBRANO-ESPINAL, KELVIN ZAMBRANO, JONATHAN STEPP, RYAN MILLER, NANCY VARGAS, and MARGARET FERNANDEZ, the defendants herein, shall forfeit to the United States any and all property constituting or derived from any proceeds they obtained directly or indirectly as a result of the said violations; and, any and all of their property used or intended to be used in any manner or part to commit or to facilitate the commission of the said violations; and any property, real or personal, involved in such offense, or any property traceable to such property.

A TRUE BILL.

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.